## Case No. 3,930.

DIXON et al. v. The CYRUS.

[2 Pet. Adm. 407.][1]

District Court, D. Pennsylvania. 1789.

SEAMEN'S WAGES—FORFEITURE BY MISCONDUCT.

The libellants, seamen of the Cyrus, at the commencement of the voyage, had refused to proceed to sea, unless the rigging was repaired. An accommodation took place, and they performed the voyage. After the arrival of the ship at Philadelphia, they attended on board to do duty, but finding other persons employed to unload the ship, and no provisions prepared for them, they went on shore. It was attempted to forfeit their wages for the voyage, in consequence of the conduct of the seamen in the beginning of the voyage, and also by their having left the ship. The court decreed wages for the voyage.

[Cited in The Nimrod, Case No. 10,267; The Mentor, Id. 9,427; Magee v. The Moss, Id. 8,944; Grannon v. Hartshorne, Id. 5,689; The Childe Harold, Id. 2,676; The Wenonah, Id. 17,412; Halverson v. Nisen, Id.

[1] [Reported by Hon. Richard Peters, District Judge.]

5,970; The Hudson. 6 Fed. 830; The Heroe. 21 Fed. 528; The Noddleburn, 28 Fed. 857; The Lizzie Frank, 31 Fed. 480.]

Before PETERS, District Judge.

As there are no depositions filed in this cause, but the suit has, by consent of counsel on both sides been conducted on oral testimony. I may not perhaps be able to state the case with that precision I might otherwise have done. I have, however, given close attention to the witnesses and find the leading circumstances to be follows. The libellants entered on board the ship Cyrus. Thomas Scott, master, in the month of April last, and signed articles in the usual form for a voyage from Philadelphia to the port of Lisbon and back again. When the ship had got under way, the mariners discovered that she was very badly provided with running rigging; that many of the halliards and ropes were not in the usual condition of a vessel entering upon a voyage: that they could not clue the sails without going aloft to search for the proper ropes; and that, upon enquiry, they found there was but one coil or spare running rigging on board to remedy these defects. Whereupon, when the ship had come to, a few miles down the river, they remonstrated to the captain, and finally refused to weigh anchor, or proceed with the vessel in her present condition. How this remonstrance and refusal was conducted, whether in a mutinous disorderly manner or otherwise, does not appear by any part of the testimony. Upon this the captain dispatched a messenger to the city to inform the owners of his situation, and in consequence of this intelligence, Captain Keith, one of the owners, went down to the ship, and took with him several hired men, either to assist in getting the vessel under way, or to compel the mariners to do their duty. What passed between Captain Keith and the discontented seamen does not appear, except that, before he left the ship, he prevailed with them to proceed on the voyage, promising that if they would do their duty, and behave themselves well for the remainder of the time, no notice should hereafter be taken of their late conduct, nor any deduction made from their wages on that account, Captain Scott standing by and hearing these assurances given them. This affair occasioned a delay of the ship of two or two and a half days. The vessel then prosecuted her voyage, during which the mariners supplied the deficiency of running rigging by untwisting old ropes and manufacturing them over again into ropes fit for the purposes wanted. In due time the ship completed her voyage, and returned safe to Philadelphia. On the third of September the ship was moored in the port, and at eleven o'clock in the evening of the same day, the mariners in general, if not all of them, left the vessel and went on shore. The captain being present, desired them to return early next morning to go to their work: and they came back accordingly, some at and some before day-light; but no orders were given as to what they were to do, except to two of them, who were directed to unbend certain sails, which they did. The mariners observing that men were hired by the day to unload the cargo, and seeing no preparations made for their provision, or that the kettle was cold, (as they term it,) enquired of the cook, whether he had received any orders to provide for the crew, who told them he had not received any; and they knowing that there was no meat on board, the last of their store having been consumed the day before, again left the ship, and went on shore. It appears that some of the libellants, and particularly John Winters,[2] went frequently afterwards to visit the ship, and sometimes staid two hours on board, without receiving any orders from the captain to go to work; and that the captain saw them come and go without desiring their attendance, or reproaching them for their absence, until at length they looked upon themselves as discharged from the ship's service.

Upon these facts the counsel for the respondents hath urged against the libellants that they have in two instances violated their contract, and forfeited their wages. First, in a mutinous refusal to do their duty on board, on a frivolous pretence of deficiency in the vessel's rigging; and secondly, In leaving the ship as soon as she arrived in port, and before her cargo was discharged. That it is manifest their complaint of the rigging was frivolous, because the ship hath completed her voyage without any addition of naval stores, observing that it would be very injurious to commerce if mariners should, on slight causes and artificial complaints, be encouraged to justify a disobedience of orders, as they are, for the most part, not in a situation to answer the damage they may occasion to owners by the delays and losses which such disobedience may incur. That the promise of the owner, in the present case, that no deduction should be made from the wages of the libellants on account of their refusal to do duty, cannot avail, or in the least affect the strict operation of the articles, because the mariners do not contract with the owner, but with the captain; and that it is for this reason only, they are allowed to sue in the admiralty, and have a lien upon the ship. Molloy, 236, 244, 250; 1 Salk. 33. So that the owner, being no party to the articles, cannot by his engagement alter the terms thereof, or qualify their construction. That although Captain Scott was present and heard the assurances given by the owner to the libellants, yet, as he did not himself expressly join in those assurances, the penalty on a breach of the arti-

---

[2] John Winters, one of the libellants, was alone able to give the usual security on instituting the suit; but it was agreed by counsel, that the issue of the cause with respect to him, should be conclusive as to the rest.

cles remains in full force against the mariners; and that these articles, like other contracts, ought to be strictly construed. And lastly, that their deserting the ship before the cargo was discharged, without the express permission of the captain, is of itself a forfeiture of wages by the plain and direct terms of the articles.

In attending to these facts and arguments, I find it necessary to observe that shipping articles, as they are usually drawn, fully express the duties and obligations on the part of the mariners, and the penalties they are liable to for non-performance, but on the part of the captain there is no stipulation mentioned, except the payment of monthly wages, which is made the sole consideration. But notwithstanding this silence of the articles, law and reason will imply sundry engagements of the captain to the mariners. Two of which are: First, that at the commencement of a voyage, the ship shall be furnished with all the necessary and customary requisites for navigation, or, as the term is, shall be found seaworthy; and, secondly, that the captain shall supply the mariners with good and sufficient provisions whilst they are in his service. I am far from wishing to intimate, that it is either necessary or proper that the merchant or captain should be obliged to exhibit to the mariners he engages, a list of his stores, to take their opinion whether they are sufficient or not; yet when from accidental neglect or otherwise, there is a manifest and visible deficiency, the mariners may reasonably complain and remonstrate—as in the present case, when the seamen were obliged to go to the main top to command those ropes which are usually within reach from the deck, and there could not be found on board a sufficiency of spare rigging to supply the defect. I think such a vessel cannot be said to be duly furnished for a voyage, according to the implied contract of the captain. I say such a complaint may reasonably be made at the commencement of the voyage, whilst it is yet in the power of the captain to procure all necessaries; for when the ship is at sea, nothing but inability can excuse the mariner for a refusal of duty, whatever deficiencies may then occur, or be discovered. With respect to the objection made to the validity of the owner's promise, I would observe, that although the contract of the mariner is always with the captain by name, yet it is the owner who actually pays the wages; and it happens not unfrequently, that the owner engages the mariners before it is known, who the captain for the voyage will be. But the law makes no distinction; the mariner may sue either the ship, the captain, or the owner for wages duly earned, and a summary jurisdiction is allowed to him. But, to give full force to the argument, and suppose, that because the articles are made in the name of the captain, he alone could make the promise alluded to with effect, yet as Captain Scott stood by and heard the owner give these assurances to the libellants, and did not declare his dissent, it amounts to such a tacit acquiescence as ought in equity to be construed a confirmation of the engagement on his part. For it ought not to be supposed, that Captain Scott stood silent by, with a reserved determination that after the mariners should have performed the services of the voyage, he would cut them off from their wages, by disputing the authority of the owner to pardon a breach of the articles. To close this part of the subject.—Supposing the libellants to have been ever so reprehensible, and liable in damages for the delay they had occasioned, yet they could not by the terms of the articles, forfeit more wages than what were due at the time of committing the offence: for how can wages be forfeited which have not yet accrued?

I now come to the second charge laid against the libellants, viz. their leaving the ship at the conclusion of the voyage before the cargo was discharged, contrary to an express article in the contract. And here there can be no doubt but that the general maritime law, and the tenor of most, if not all shipping articles, requires that the mariner shall stay by the ship until her cargo is safely landed, under the penalty of forfeiting all the fruits of his preceding labour, if he wilfully and disobediently abandons his duty in this particular. But if the owner or captain, as is frequently the case, shall find it more for his interest to hire men on daily pay to unload the ship, than to keep the crew under monthly wages, and find them with provisions in port, he may certainly release the mariner from this part of his duty. This appears to me to have been the intention in the present case. No provisions were on board, nor any ordered for the use of the crew. The mariners, or some of them, repeatedly left and returned to the ship in the presence of the captain, without his expressing the least dissatisfaction at their conduct, or giving them any orders of duty. Men were hired by the day to discharge the cargo, without any intimation given to the libellants that this was done in consequence of their absence. And finally, some of the crew have been fully paid off, although under the same circumstances of conduct with the libellants. These strong marks of consent on the part of the captain, and more especially the total want of provisions on board, are sufficient, I think, to screen the libellants from being considered as deserters, so as to forfeit their wages. See the case of Swift v. The Happy Return [Case No. 13,697]. I adjudge and decree, that the libellants have and receive their wages to the third of September, instant; and that the respondents pay the costs of this suit.