## THE NODDLEBURN. (CURTIS, Libelant.)

*(District Court, D. Oregon.* October 23, 1886.)

1. **COURTS—UNITED STATES DISTRICT COURT—JURISDICTION OF TORTS ON THE HIGH SEAS.**
   The district courts have jurisdiction of torts committed on the high seas, without reference to the nationality of the vessel or the parties thereto. *Bernhard* v. *Greene*, 3 Sawy. 230, affirmed.

2. **SEAMEN—INJURY—SEAWORTHINESS OF VESSEL.**
   When the master of a British vessel knowingly allows a rope to remain in an insecure condition, and a seaman, in the proper discharge of his duty, falls to the deck therefrom, and is hurt in consequence of such neglect, the seaman may maintain a suit against such vessel in this court for damages.

3. **SAME—CRANE-LINE—PURPOSE AND USE OF.**
   The primary purpose of a crane-line is to steady the back-stay, and, in blustering weather, it is apt to chafe where it is joined to the stay or shroud; but it may also be and is used as a foot-rope for light work, the party doing so taking the precaution to keep one hand on, or arm or leg around, the stay or shroud, as a support in case of accident.

4. **SAME—WAGES.**
   When a British seaman is unable to complete the voyage from this port to the port of discharge in the United Kingdom, by reason of injuries sustained while in the service of the vessel, and is sent by the master to the hospital, he may maintain a suit in this court to recover the wages earned and unpaid at the time of going to the hospital.

5. **DAMAGES—PERSONAL INJURY.**
   Estimation and allowance of damages for injury to the ankle by falling from the crane-line on the foremast shroud and back-stay.

In Admiralty. Suit for damages and wages.

*Edward N. Deady* and *Horace B. Nicholas,* for libelant.

*C. E. S. Wood,* for defendant.

DEADY, J. This suit is brought by the libelant, Daniel Curtis, against the British bark Noddleburn and her master, Joseph Hogg, to recover $5,000 damages for an injury to his ankle, received while serving on the vessel as a seaman, and for a balance of $70 due him as wages on account of such service.

From the pleadings and evidence I find the following facts:

On March 24, 1886, the libelant duly shipped on the Noddleburn, at Liverpool, for a voyage to this port, and thence to a port of discharge in the United Kingdom, as an able-bodied seaman, at and for the monthly wages of 2 pounds and 15 shillings. On April 23, about 4 P. M., in latitude about 15 N., in the Atlantic ocean, as the vessel was being put about, the libelant was ordered by the mate to go aloft and pass the maintop gallant stay-sail sheet over the middle stay, from the port to the starboard side. When the libelant reached the foretop he took hold of the bight of the sheet, and attempted to haul it; but, finding that it would not come, he concluded that the hooks on the end of the sheet were foul of the jib-halyards, and went out on the rope sometimes called the crane-line, between the foremast back-stay and the after foremast shroud, and, holding to the shroud with one hand and taking the sheet in the other, attempted to shake it loose, when the seizing fastening the line gave way, and the libelant fell to the deck, a distance of 30 or 40 feet,

the weight of his body loosening his hold on the shroud, and struck on a spare anchor lying on the deck between the waist and the foremast, thus spraining his right ankle, and fracturing obliquely the external *malleolus*, or lower end of the *fibula* or outer bone of the leg. The master, with the aid of some of the crew, pulled the ankle into place, but did not discover the fracture of the bone then or afterwards. He also bandaged the leg, and put it into splints, and then sent the man to his bunk, but did not visit him until the next day. In the meanwhile the leg swelled so that it became very painful, and the libelant removed the bandages. The master had the bandages put on again without the splints, and the man remained in his room for several weeks, with his leg more or less bandaged, and once again in splints a short time; the master visiting him not more than twice in that time, besides having him go aft occasionally, at much pain and inconvenience to the libelant. In the course of six or seven weeks the master had a pair of crutches made for the libelant, and, with his assent, set him to work cleaning the lamps and brass-work during the day.

On August the 12th the vessel arrived in Astoria, where, after a delay of a couple of days, the master called a doctor on board to examine the libelant's leg, but he did nothing for it; saying that it would have to be reset, while the master insisted it was nothing but a sprain, and would get well in time of itself. On August the 19th the vessel arrived at Portland. By the direction of the master the libelant did duty as night watchman from the arrival of the vessel in the Columbia river until August 25th, when he was, at his own urgent request, sent to the Good Samaritan hospital, where he still remains. On his arrival there, according to the testimony of Dr. Saylor, the physician in charge, his foot and leg, from the toe to the knee, were very much swollen; so much so that the condition of the ankle and the extent of the injury could not then be determined. Absolute rest was then prescribed, and a plaster cast put on the ankle for some five or six weeks, when it was ascertained that the external *malleolus* was fractured, and had united so as to leave the end of the bone projecting outwards instead of downwards; thus leaving the ankle, or *tarsus*, without any outer support, so that when the libelant steps on anything but a flat surface his foot is likely to turn under him, for which reason he will never be able to follow the sea again.

The master, acting probably under the impression that the injury to the libelant was only a sprain of the ankle, did not pay much attention to him, or manifest any particular concern for his comfort or recovery. After sending him to the hospital he did not visit him, or pay him any attention, until he heard this suit was about to be commenced,—September 17th,—and then only on that account.

Shortly before the accident to the libelant one of the crew informed the mate that the seizing on this crane-line was chafed and insufficient, when the latter sent another man up, with proper material, to put the line in good condition. As the man was going up the rigging to make the repair the master saw him, and asked the mate what he was doing there. The mate informed him, when the master ordered him to recall the man, and set him to work on the deck with sand and canvas, at the same time accusing him, in obscene and filthy terms, with trying to curry favor with the men by giving them "soft jobs." The man was recalled, and the line not repaired, and hence the injury to the libelant. The master denies this statement in a vague and argumentative way, but the testimony of the mate and the two men concerned in the transaction is clear and convincing.

The defense made on the argument rests mainly on points of law: (1) The court has no jurisdiction in the premises; (2) by the British law there is no implied warranty of seaworthiness of the vessel, or her

equipment, in the contract between the seaman and her owner; and (3) the crane-line was not a foot-line, and therefore the libelant was guilty of negligence in going on the same as he did, and thereby contributed to the injury he sustained.

The question of jurisdiction was not pressed by counsel, but merely stated and submitted.

In *Bernhard* v. *Creene*, 3 Sawy. 230, this court, after a careful examination of the subject, held, in the language of the syllabus, that (1) "the district courts of the United States, as courts of admiralty, have jurisdiction of torts committed on the high seas, without reference to the nationality of the vessel on which they are committed, or that of the parties to them;" but that (2) "such jurisdiction will, in the discretion of the court, be declined in suits between foreigners, where it appears that justice would be as well done by remitting the parties to their home forum;" and (3) "where the suit is between foreigners, who are subjects of different governments, and therefore have no common home forum, the jurisdiction will not be declined." The opinion in this case was delivered and published over 12 years ago, and, while it has attracted attention, it has not, that I am aware of, been the subject of adverse criticism.

In *The Belgenland*, 114 U. S. 355, S. C. 5 Sup. Ct. Rep. 860, Mr. Justice BRADLEY, in delivering the opinion of the court, did me the honor to cite it with express approbation on the question of jurisdiction, where the *res* or parties have no common forum. Until the case is directly overruled, it will be regarded as authority in this court.

The only decision in the English courts on the second point is the case of *Couch* v. *Steel*, 3 El. & Bl. 402, (24 Eng. Law & Eq. 77.) This was an action at law in the queen's bench by a seaman to recover damages for injuries sustained in consequence of the vessel leaving port in an unseaworthy condition. There was no allegation that the owners knew the vessel was unseaworthy. On demurrer, the court held that the plaintiff could not recover, as there was no implied warranty on the part of the owner that the vessel was seaworthy. Mr. Parsons (2 Ship. & Adm. 78) says: "This decision is clearly repugnant to the principles of the American authorities on this subject, independent of statute provisions;" citing *The Cyrus*, 2 Pet. Adm. 407, 411; *The Polly*, Id. 420. The case was decided in 1854, apparently without deliberation. The question was rather a moot one than otherwise in the case, as the right to recover on the second count was sustained, on the ground that the vessel went to sea, contrary to statute, without a medicine chest. This ruling, in my judgment, is a harsh and unjust one. It was made, not in a court of admiralty, but of law, and proceeds on considerations more applicable to employment on land than at sea, if to either. *The Chandos*, 6 Sawy. 549; S. C. 4 Fed. Rep. 645. In his opinion, Lord Chief Justice CAMPBELL rests his conclusion on the case of *Priestley* v. *Fowler*, 3 Mees. & W. 1, in which the rule was first established that an em-

ployer is never responsible for an injury sustained by his servant or employe, in consequence of the negligence of a fellow-servant, so long as the employer exercised due diligence in the employment and retention of the latter. But this partial rule has been so modified in the national courts, and those of many of the states, that "where a servant is authorized and required by his employment to furnish or provide suitable material or appliances for the work in which his fellow-servants are engaged, whether under his special direction or otherwise, and one of them is injured by reason of his neglect or omission in either of these respects, the common master or employer is responsible in either case." *Gilmore* v. *Northern Pac. Ry. Co.*, 9 Sawy. 563; S. C. 18 Fed. Rep. 869; *Hough* v. *Railway Co.*, 100 U. S. 213; *Chicago, M. & St. P. Ry. Co.* v. *Ross*, 112 U. S. 377; S. C. 5 Sup. Ct. Rep. 184; *Northern Pac. Ry. Co.* v. *Herbert*, 116 U. S. 647; S. C. 6 Sup. Ct. Rep. 590. And it is very doubtful if the decision in *Couch* v. *Steel* would now be followed in England; especially in the face of the British shipping act, passed in the same year, giving to a fourth of the crew of a vessel a right to have a survey, and making unseaworthiness a sufficient excuse for desertion, or a refusal to join the ship after signing the articles. 1 Kay, S. & S. 575.

But admitting, for the occasion, that this court ought to follow the ruling in *Couch* v. *Steel*, in a suit by a British seaman against a British vessel, it is not in point. The circumstances are different. In that case it did not appear that the owner had knowledge of the unseaworthiness of the vessel; but in this one there was actual knowledge on the part of both the master and the mate of the unsound and unseaworthy condition of the vessel in the particular of this rope, coupled not only with willful negligence, but wanton indifference, on the part of the former. It is admitted that the master stands for and represents the owner while in charge of the vessel, and, in my judgment, the mate, when not in the immediate presence of the former, does also. *The Chandos*, 6 Sawy. 548; S. C. 4 Fed. Rep. 645.

The point of contributory negligence is the one most insisted on by the defense. Considerable testimony was taken on the question of what is the purpose of the crane-line, and whether it may properly be used as a foot-rope. The crew of the vessel, and others who had been to sea as seamen and mate, testified that it was used, when convenient, as a foot-rope. Several masters of British vessels in this port swore that it ought not to be used as a foot-rope. The master, while stating that it is not primarily a foot-rope, in effect admitted that it might be and was so used, with care, by holding on to the stay or shroud with one hand, or, as he aptly put it, the man keeping "one hand for himself and the other for his owner."

The evidence and argument of the defense concerning the libelant's use of the crane-line assumed that he stood thereon with both feet, and pulled at the sheet with both hands, thus putting both his weight

and strength on the rope, without holding on to anything. But there is no evidence in support of this assumption. The only evidence on the subject is the testimony of the libelant. He says that when he found the lower end of the sheet was foul, and would not come up, he concluded that the hooks on the end of it were fast in the jib-halyard on the port side of the vessel. The bark was going about, and dispatch was necessary, and so, for the purpose of loosing the sheet, he went out on the crane-line, as nearly directly over it as he could, and, holding on to the shroud with one hand, shook the sheet with the other for the purpose of loosing the hooks, when the line gave way, and precipitated him to the deck. The libelant impressed me favorably. His manner was modest, and his speech moderate, and he spoke as one telling the truth. In addition, his story in this respect is intrinsically probable. Any seamen would know that, if the hooks were fast, pulling on the sheet, and particularly in the line from the side of the vessel to the foretop, was not the way to loose them; and that the proper method was to get directly over them, as near as possible, and shake them loose, as an angler would his hook when caught on something in the bed of the stream. Substantially, this is the libelant's account of how he went on the crane-line, and what he did there.

In *The Chandos*, 6 Sawy. 547, S. C. 4 Fed. Rep. 645, speaking in the light of the evidence in that case, which was limited, and from no other knowledge or information, I said, substantially, that the crane-line is not primarily a foot-rope, but intended to keep the stays steady; that it is often used by seamen in going from the top to cast off the stop on the foretop-gallant halyards, but that it is considered an insecure footing, and one that ought not to be used without other support, or more than ordinary caution. On further acquaintance with the subject, and particularly from the evidence in this case, I am satisfied that this statement of the purpose and use of this rope in the equipment and conduct of a vessel is somewhat narrower than the fact, as known and practiced by seamen. I think the crane-line is very commonly used to step or walk on, and even to do light work on,—such as to pass a rope,—but not to stand and heave and haul on; but, generally, with one hand on, or arm or leg around, the shroud or stay, as a security. And such was the use made of it by the libelant. Indeed, the use he made of it would not be considered negligent, even under the view taken of the matter in the case of *The Chandos*. In that case the libelant, a heavy man, went up the fore-rigging, and onto the crane-line, in the night, to cast off the stop on the foretop-gallant halyards, and, instead of holding on to the shroud or stay in any manner, sat or stood on the line with all his weight, while using both hands to loose the stop, when the line parted at the hitch near the stay, and he fell.

It is also suggested that the libelant might, with care, have observed the faulty condition of the rope before going on it. But the

line gave way at the shroud, and the chafing of the seizing, as it rubbed against the outside of the shroud, would not be apparent to one coming onto the line from the opposite side thereof, as the libelant did.

In conclusion, in my judgment, the libelant was not guilty of contributory negligence in going out on the crane-line when and as he did, but his fall therefrom, and the injury sustained thereby, are directly attributable to the unsound and unseaworthy condition of this rope, resulting from the willful negligence and wanton indifference of the master in the premises.

It only remains to be considered what damages the libelant is entitled to recover. According to the articles, he is in his thirty-first year. His occupation is that of a seaman, at which he can probably earn $150 a year besides his living. He will not be able to do duty as a seaman again; but he can work at any common labor where he can have a smooth, flat surface to stand or walk on. Assuming that his power to earn money is permanently diminished one-third by the injury, I will allow him $1,000 on this account, and to this add $500 as a compensation, in some measure, for the bodily and mental suffering he sustained during the four months which elapsed between the date of his injury and his removal to the hospital, and the cost and expense of maintaining this suit for redress.

It is admitted in the answer that the sum of $70.70 is due the libelant on account of wages. Although the voyage for which the libelant shipped does not terminate in this port, but in the United Kingdom, still it is practically at an end. The man is yet on crutches, and will be unable to do a seaman's duty when he can walk without them. He has been sent to the hospital by the master, at his own request, which, under the circumstances, is equivalent to a rescission of the contract. It is also better for the owners that he be paid his wages, and allowed to leave the vessel, and thereby absolve it from any further responsibility on his account. To this amount of $1,-570.70 there probably ought to be added the sum of $500, in consideration of the neglect and indifference with which the libelant was treated by the master after his injury. Instead of going forward every day, as he should have done, and looking after the man's leg, and doing what he could to make him comfortable, he contented himself with one or two visits, and occasional inquiries of the cook and steward; and was even cruel enough, on some occasions, to have the man hobble aft, without a crutch, to see him, and get a dose of castor oil. According to his own statement, the master did not visit the libelant after the accident until the next day, but whether early or late he does not state. But, under the circumstances, I prefer to err in fixing the amount of damages against the libelant rather than in his favor.

The libelant is entitled to a decree for $1,570.70, and the costs and disbursements of the suit.