DAVID HALL and EDWARD WOOD *v.* THE AMER-
ICAN SCHOONER "F. W. HOWE" and S. B. ATKIN-
SON, Master, etc.

DECIDED: APRIL 15, 1902.

1.  In an action in admiralty *in rem*, based on Section 4568 of the R. S.
    U. S. as amended by the Act of December 21, 1898, where it was
    shown that a schooner bound on a voyage from New York to the
    Island of Mauritius, and from thence to Port Townsend in the
    State of Washington as her port of destination, put into the port
    of Honolulu with two members of the crew suffering from an ill-
    ness in the nature of scurvy, or beri-beri, and where it is claimed
    that such illness was the result of a lack of proper provisions and
    of the usual anti-scorbutics which the statute requires to be pro-
    vided for each member of the crew daily; and where it was shown
    that forty days out from Mauritius the members of the crew were
    compelled, in order to supply themselves with fresh drinking wa-
    ter, to gather rain water from the deck of the vessel; and it be-
    ing further shown that it was the intention of the Captain when
    he left the Island of Mauritius to sail directly to Port Townsend;
    *Held*, that the fact that immediately after reaching the port of
    Honolulu, the Captain of the schooner made a large requisition
    for supplies, including both food, water and anti-scorbutics was
    strong proof that the ship had been insufficiently provisioned for
    her voyage, and that there had been a shortage in the rations of
    the men.
2.  The master's order for supplies is sufficient proof of their necessity.
3.  The burden of proof is on the ship to show that it was fitted out
    with all the needed articles of food and medicine, and it is not
    alone what provisions and medicine are aboard, in cases of this
    character, but what the seamen are supplied with, and how they
    are supplied with it, that controls.
4.  Under Section 4612 of the R. S. U. S., as amended by the Act of
    Congress of December 21, 1898, certain daily rations are to be
    served to the members of the crew; and the mere furnishing of the
    amount of food required by law to be given to the men, if the same
    is not edible, is not a compliance with the terms of the statute.
5.  Where it was shown that there were no weights or measures on
    board the schooner, as required by Section 4571 of the R. S. U. S.,
    but that the cook guessed at the amount of the food that the men
    received, *Held*, that neither the master nor the cook has a right
    to issue to the men provisions according to a method of his own,
    unless the men agree to such method, and even then the action

is doubtful. When the statute regulates what the rations shall be, the statute must be followed. Except only in cases of great sea peril, those statutory rations must be supplied, and must be reasonably well cooked.

In Admiralty. $\left\{ \begin{array}{l} \text{Action } in \ rem \text{ to recover addi-} \\ \text{tional wages of seamen, under} \\ \text{Section 4568 R. S. U. S. as amended} \\ \text{by the Act of December 21, 1898,} \\ \text{and for damages.} \end{array} \right.$

*Robert W. Breckons* and *J. J. Dunne*, for libellants.
*Kinney, Ballou & McClanahan*, for libellees.

Estee, J. This is a libel *in rem* brought by two of the crew of the schooner "Frank W. Howe" to recover certain penalties imposed by Section 4568 of the Revised Statutes of the United States as amended in 1898, and recoverable as additional compensation for a failure on the part of the master of the vessel to supply libellants with good and wholesome provisions including water, in accordance with the agreement set forth in the shipping articles and as required by law; said libellants claiming that the provisions supplied them were deficient both in quantity and in quality. They also ask for additional damages in the sum of five thousand dollars each for injuries sustained by them and each of them in that they and each of them became and were and now are afflicted with illness and disease which they allege to be scurvy as a result of not being properly supplied with wholesome food or with proper anti-scorbutics while on the voyage hereinafter referred to. The libellants constitute two members of a crew of four men in the forecastle of this vessel.

It appears that on or about the first day of July, 1901, they shipped at the port of New York on the said schooner "F. W. Howe" which was bound on a voyage from said port of New York to the Island of Mauritius in the Indian Ocean; and from there back to a port in the United States for a final discharge; that the vessel reached the Island of Mauritius after a voyage of 119 days, delivered cargo and made freight, and then proceeded on the voyage to Port Townsend in the State of Washington,

United States of America. That while on this voyage from Mauritius to Port Townsend, the libellants became ill and incapacitated for labor, so much so that the master of the vessel was for that and other reasons compelled to bring his vessel within, and enter her at, the port of Honolulu in the Island of Oahu, Territory of Hawaii, as a port of necessity where said schooner arrived on March 19, 1902, and where the libellants were discharged and placed in a hospital for treatment.

The libel alleges that during the voyage from the port of New York to the Island of Mauritius, the libellants were on a short allowance of good and wholesome food and especially so in that the provisions supplied to them were so imperfectly prepared as to be unfit for food; that neither lime juice nor sugar was served daily nor was vinegar regularly served; that potatoes were only served to them for fourteen days of that voyage and onions only for three weeks; that they did not receive the quantity of bread, coffee, sugar, tea, lime juice, vinegar or vegetables required by law, and that instead of tea or coffee they received an indescribable compound unfit for use which was neither tea nor coffee.

It is further claimed that on the voyage from Mauritius to Honolulu, which occupied about 110 days, the same conditions existed; that the bread and beef were so imperfectly prepared that the men as a rule could not eat it; that the salt had to be washed out of the beef after it was cooked and before it could be eaten at all; and that on the voyage from Mauritius to Honolulu, and about thirty days after leaving Mauritius, the supply of fresh water was cut off and the men were compelled to drink the rain water which was gathered by them from or had accumulated on the deck of the vessel.

It is admitted that the libellants became ill on the voyage from Mauritius to Port Townsend, and that as one of the results of such illness, the master brought the vessel into this port; but it is denied that the illness of libellants arose by reason of any connection between libellants and the said vessel or master or owners thereof or that their illness was caused by any shortness of provisions.

It is admitted by defendant that lime juice was not served to the men on the voyage from Mauritius to Honolulu, although it was served in the cabin; and that the sugar gave out about a week before the vessel arrived at Mauritius from New York. In reference to the shortage of potatoes the defendant alleges that they were served liberally on the voyage from New York to Mauritius as long as they remained good, but that they rotted and were thrown overboard. It is alleged that substitutes for the lime juice, sugar and potatoes were supplied in the form of vinegar, stewed fruits, molasses and sweet potatoes, although these latter gave out within a few weeks after leaving Mauritius and before reaching Honolulu. The answer claims that onions were served on the voyage from New York to Mauritius with the exception of about a week before reaching there, where it is alleged a fresh supply were obtained but that they too ran short two weeks before reaching Honolulu.

The leading questions presented for the consideration of the court in this case are two.

1. Were the proper provisions supplied the seamen on board this vessel in accordance with the statutory scale; and if not, were proper substitutes provided?

2. Was the illness of the libellants the result of improper food or lack of the necessary anti-scorbutics required to be provided by the agreement set forth in the shipping articles?

If it is a fact that the prescribed rations were not provided the men on this voyage or when provided, were bad in quality, the ship is liable for the penalties provided by law whether the men were ill or not.

"It is undoubtedly true that the master represents the owner in respect to the personal duties and obligations which the latter owes to the seamen, such, for instance, as the maintenance of the ship and her apparel in a safe and seaworthy condition, procuring repairs and supplies, the supplying of the crew with sufficient food and with medical attendance and care in case of injury or sickness, and for his neglect in any of those particulars the owner is liable." *Olsen v. Oregon Coal & Navigation Co.,* 104 Fed. Rep. 574-576.

And the mere furnishing of the amount of food required by law to be given to the men, if the same is not edible, is not a compliance with the terms of the statute. If it be true that the food provided the men on this voyage was so improperly prepared that the men could not eat it, then it was not a lawful ration.

Congress has provided by an amendment to Section 4612 of the Revised Statutes of the United States, which amendment was passed December 21, 1898, (Vol. 30 U. S. Stats. at Large, P. 762) that a certain scale of provisions shall be adopted and served out to the crews of all American vessels daily during a voyage and in accordance with that law, the shipping articles of the schooner "F. W. Howe" had embodied therein the statutory scale of provisions for each seaman, which is as follows:

"Water, 4 quarts daily; biscuits, ½ pound daily; fresh bread, 1½ pounds daily; potatoes or yams, 1 pound daily; coffee, (green berry) ¾ of an ounce daily; tea, ⅛ of an ounce daily; sugar, 3 ounces daily; lard and butter, 1 ounce each daily; salt beef, 1¼ pounds three times a week; salt pork, 1 pound three times a week; flour, ½ pound three times a week; canned meat, 1 pound twice a week; fish, 1 pound once a week; canned tomatoes, ½ pound twice a week; peas, a third of a pound twice a week; rice, a third of a pound twice a week; molasses, ½ pint three times a week; pickles, ½ pint twice a week; vinegar, ½ pint twice a week; dried fruits, 3 ounces three times a week; corn meal, 4 ounces twice a week, onions, 4 ounces three times a week; with mustard, pepper and salt sufficient for seasoning."

Section 4612 of the Revised Statutes as amended further provides certain substitutes for said rations as follows:

"One pound of flour daily for the daily ration of biscuit or fresh bread; two ounces of dessicated vegetables for one pound of potatoes or yams; six ounces of hominy, oat meal or cracked wheat, or two ounces of tapioca for six ounces of rice; six ounces of canned vegetables for ½ pound canned tomatoes; one-eighth ounce of tea for ¾ of an ounce of coffee; three-fourths of an ounce of coffee for one-eighth of an ounce of tea; 6 ounces of canned fruit for 3 ounces of dried fruit;

onehalf ounce of lime juice for the daily ration of vinegar; four ounces of oatmeal or cracked wheat for one-half pint of corn meal; two ounces of pickled onions for four ounces of fresh onions."

The shipping articles imply:

1. That the ship is seaworthy, and 2, that good and sufficient provisions are supplied. Section 4564 Revised Statutes of the United States. *Olsen v. Oregon Coal and Navigation Co.*, 104 Fed. 574-576; *Dickson v. The Cyrus*, 2 Pet. Adm. 407.

The fact that the vessel is supplied with the proper provisions is one of the elements of sea worthiness, and whatever else a ship may be short of, there can be no excuse (except in case of a great peril at sea, which did not occur in this instance) for shortness of the water supply, and more especially when the vessel is sailing over tropical seas as in this case. The voyage of this vessel was over three-fourths around the world, and yet it is undenied that within forty days after leaving Port Louis, Island of Mauritius, the men were made to gather water from the deck of the vessel to supply themselves with fresh water for drinking purposes. It rained, and so the men in the forecastle had drinking water. But what if it had not rained? Then the crew would have been subject to great peril to health and life. It is the duty of a master to provide for all such contingencies.

"If there was a shortage of water, the ship is as liable as if there was a shortage of food. *The Mary Paulina*, 1 Sprague, 45; *Collins v. Wheeler,* 1 Sprague, 188.

A ship cannot sail out of port with a crew unprovided with good, wholesome water or without reasonable food supplies, without violating the law. The Captain is given great powers over his ship and over his men, but he has no right to imperil their health or endanger the ship by failure to furnish proper food or water. The crew of this vessel consisted of one Filipino, who could not speak English, one Italian who also could not speak English, and two simple minded negroes, the libellants, whom it is admitted always did their duty.

As to the shortage of food in the case, it appears to have consisted mainly in a shortage of the vegetable foods, which

were among the most necessary articles of food required on this voyage, in the preparation of this and the other food and the scarcity and impurity of the drinking water. These were the chief causes of complaint.

It is claimed by the defendant that the two libellants were not ill by reason of any shortage of food or lack of variety, but that they were suffering from beri-beri, a disease which arises from different causes than does scurvy. It is admitted that scurvy is caused by a want of a suitable vegetable diet, while beri-beri often arises from bad sanitary conditions and feeding on rice without sufficient fatty or nitrogenous food substances.

Dr. Sinclair, called by the defense, testified that in his judgment, the men had beri-beri. Dr. Humphris, another equally well known physician called for libellants, testified just as positively that he believed both men had scurvy, although Wood did not show it as much as did Hall; that many of the well known tests had been applied in the case of Hall, such as the application of electricity; that extreme poverty of the blood was shown by an examination in the case of both men. It was agreed by both physicians, that the two diseases were dangerous; that these men might die at any moment; and that impure air and an improper diet contributed to both diseases.

In relation to the claim that Hall was suffering from a secret disease, Dr. Humphris testified that he had made a careful examination of the man and that he found no symptoms of any such disease, Hall himself testifying that he had never had a secret disease in his life and that he was a strong man when he came aboard the "Howe." No such charge was made against Wood.

It appears from the evidence that both of these men did their work faithfully until too ill to do so just before reaching Honolulu. It is a curious circumstance that it was not until the trial of this case that the captain and the cook discovered that Hall was sick when he came aboard. That fact was not entered in the captain's log book, where, if true, it should have been entered as required by law, nor was that fact otherwise made known by the captain.

This man worked regularly on the ship for about five months as an able seaman and he did not develop this or any other illness until within six weeks of reaching Honolulu.

There were eight men aboard of this vessel, the captain, the first and second officers, the cook and the four men in the forecastle. The forecastle was a small place not exceeding five feet by ten in size, and these four sailors were compelled to eat and sleep in this place. It is admitted that the forecastle leaked badly and was constantly wet from the rain. One sick man left the vessel at Mauritius and went into a hospital. No entry is made in the log book of the nature of the illness of this man, as was required by Section 4290 (Subdv. 5) Revised Statutes of the United States, to-wit:

"Every case of illness or injury happening to any member of the crew, with the nature thereof, and the medical treatment," (shall be entered on the captain's log book.)

Two of the men in the forecastle, Peter, the Italian, and the Filipino, were both young men, one being twenty-nine and the other twenty, while the libellants were aged respectively, forty and forty-five; but the Filipino testified that before reaching Honolulu his limbs began to swell. This testimony is not questioned.

The ship was evidently not provisioned in any respect for so long a voyage; no sufficient anti-scorbutics were taken aboard or given in legal quantities on the voyage from New York to the Island of Mauritius, nor was any vinegar given to the men (except to be used as a liniment) on the voyage from Mauritius to Honolulu, while from New York to Mauritius a very little vinegar was furnished to the men.

It is provided by Section 4571 of the Revised Statutes, that:

"Every master shall keep on board proper weights and measures for the purpose of determining the quantities of the several provisions and articles served out, and shall allow the same to be used at the time of serving out such provisions and articles in the presence of a witness, whenever any dispute arises about such quantities......"

It appears from the testimony of the cook that there was an

utter failure to comply with the law in this respect as there were no weights or measures on board the schooner. The food was not weighed, but the matter was left to the cook who guessed at the amount of food and anti-scorbutics the men received, although it appears that the men made many complaints to the first officer about the food. The latter stated that they complained once or twice to him. But it nowhere appears that either the captain or the first officer ever went into the forecastle to inspect the food or examine the sick men. The whole matter appears to have been left to the cook, who gave the men what he pleased and cooked it as he pleased. The captain of a ship is bound to look after the welfare of his men. He is not only master of the ship, but its physician, and he must look after the health of the men as well as their discipline.

Neither the master nor the cook has a right to issue to the men provisions according to a method of his own, unless the men agree to such method, and even then the action is doubtful. When the statute regulates what the rations shall be, the statute must be followed. Except only in cases of great sea peril, those rations, or their equivalent, must be supplied and must be reasonably well cooked.

The Courts have many times held that seamen are the wards of the admiralty, *The Rajah*, 1 Sprague, Fed. Cases 11538; but whether the wards of the admiralty or not, they are entitled to what the law secures to them. The ship's articles are signed as much for their protection as for the protection of the ship.

The burden of proof is on the ship to show that the vessel was fitted out with all the needed articles of food and medicine. *Harden v. Jordan*, 2 Mason 541; *Fed. Cases* 6047. And it is not alone what provisions or medicines are aboard in cases of this character, but what the seamen are supplied with and how they are supplied with it, that controls. It was held in the case of *The Rence*, 46 Fed. R. 805, that:

"Where lime juice is not served and the crew are attacked with scurvy, the ship is liable for the damage the seamen sustain in the absence of proof that they had contracted scurvy before the voyage began."

"The fact that there was a supply of limes on board a vessel, from which the crew are at liberty to help themselves, is not a compliance with the requirements of the Revised Statutes, Section 4569, which makes it imperative upon the master to serve the crew with a regular allowance daily of anti-scorbutics." *Petersen v. J. F. Cunningham & Co.*, 77 Fed. Page 221.

There may have been food enough aboard the vessel of some kinds, but there was not either food or water as required by law, nor was the food seasonably prepared for the men. Strong proof that the ship was insufficiently provisioned for her voyage and that there had been a shortage in the rations of the men, is found in the fact that the moment the ship got into port in Honolulu, the captain made the following requisition for all these articles as appears from libellant's Exhibit D., to-wit:

"1 kit salmon tips; one box pilot bread; twenty pounds white sugar; two boxes pearl barley; one pound Royal B. powder; twenty-five pounds of coffee; twenty pounds dried peas; one gallon molasses; one-half barrel salt beef; four sacks flour; two hams; six sacks potatoes; crate of onions; two cases roast beef; twelve tins soups; two tins corn; twelve tins peas; twelve tins fruit; six tins milk; twelve tins salmon; one case lime juice; ten pounds cabin butter; ten pounds crew butter; sixty pounds cod fish; one thousand gallons water."

It has been frequently held that the master's order for supplies is sufficient proof of their necessity. *The Grapeshot*, 9 Wall, 129, 141; *The Fortitude*, 3 Summ. 253; *The Lulu*, 10 Wall, 808.

It is in evidence that when the vessel left Port Louis, Island of Mauritius, its destination was Port Townsend in the state of Washington, and no intention then existed other than to sail directly for that port. The answer of the defendant claims that the reason the captain put into Honolulu was owing to the illness of the libellants; but it appears in the captain's log book that he was afraid to approach the coast short handed; the cook testified that they came in for three reasons, broken spars, illness of the libellants and shortness of provisions. It appears clearly that shortness of provisions must have been one of the strongest

reasons for putting in to this port, as is evidenced by the extensive order for supplies which the captain made upon reaching here. It is plain if he were adequately supplied with provisions that he would not have made such an order.

.It is uncontradicted that all of the original crew in the forecastle of the vessel became more or less sick on this voyage. Johnson went to the hospital at Mauritius and was left behind, the Italian taking his place. Exactly what was the matter with him was unknown. The Filipino had swelling of the limbs before reaching Honolulu, but he is now apparently well. Hall and Wood are still sick and receiving treatment at the hospital, but are improving. So far as the weight of the testimony shows, all the men were well when they shipped at New York. Every sailor, including the second mate and the Italian who shipped at Mauritius, testify that the food was too salty to eat; that it was otherwise illy prepared, and that they ate it with difficulty. It is admitted that the tea and coffee were prepared in one vessel, although the cook said he washed it out when he changed from tea to coffee; but one witness testified that both tea leaves and coffee grounds were mixed together in one pot for the men. It is admitted that the men drank rain water from the roof of the cabin a large part of the time from Mauritius here; but the captain testified that he has always done this with his men. If he did, unless from extreme necessity, it was contrary to law.

The cook testified that he set out a pail of water for the men each day, which pail, as he thought, held from two to two and a half gallons of water; when under the law, the four men were entitled to four gallons, or a gallon apiece, daily. The forecastle leaked badly. The men complained to the first officer, but he evidently did not interfere to ameliorate their condition. While the captain and the mate testified in a general way that the men were well fed, yet when their attention was called to the specific facts in the testimony of the other witnesses, they failed utterly to know anything about them.

Counsel in the case devoted much attention to showing the nature of the disease of the libellants. Two eminent physicians, produced as experts, differed as to its character, one being pos-

itive that it was beri-beri, the other equally positive that it was scurvy. The Court will not attempt to decide at this time what was the nature of this disease, as it is not necessary to do so in this action; but if bad sanitation, unwholesome food, a lack of proper vegetable food, a shortness of anti-scorbutics, together with water short in quantity and bad in quality, and with limited sleeping quarters, can in any case contribute to illness, they must have done so in this case, especially in the absence of proof of any other valid reason or of any other cause being shown for such illness.

I find as facts that both these men were well when they went on board the ship; that they left it dangerously ill; that they were improperly housed and badly fed and were not properly supplied with anti-scorbutics.

I am, therefore, of opinion, from a consideration of all the evidence, that these libellants are entitled to extra wages for a period of 120 days inclusive, being a part of the voyage from New York to Mauritius, and from Mauritius to Honolulu, for a shortage of the food and water supply of more than one-third the daily quantity, at the rate of one dollar a day, or $120 apiece, and the said food and water being bad in quality for the same length of time, I hereby further allow each of said libellants the sum of one dollar a day for said 120 days, or $120 apiece, making a total of $240 apiece for each of the libellants, or $480 for both, and the costs of this suit.

I do not allow any especial damages to the men for the extra suffering endured by them by reason of the illness shown to exist with both of them, as they are not yet out of the hospital, and it cannot now be shown what their reasonable damage would be, if any. So the question of special damages in this regard is not considered. This I do without prejudice to any future action on the part of the libellants.

Let a decree be entered in accordance herewith.