## THE ROLPH.

## KOHILAS v. ROLPH NAVIGATION & COAL CO.

(District Court, N. D. California, Third Division. June 28, 1923.)

### No. 17319.

1. **Seamen ⊜30—Ship held liable for injuries to seamen by brutal mate.**

    A ship which employed a mate who was of great size and strength and notoriously brutal to seamen under him *held* liable for injuries to seamen inflicted by the mate.

2. **Seamen ⊜29(2)—Ship liable for injuries due to unseaworthiness.**

    A vessel and her owners are liable to an indemnity for injuries received by seamen in consequence of the unseaworthiness of the ship.

3. **Seamen ⊜11—Refusal of care and treatment for injuries renders ship liable in damages.**

    A seaman, refused by the master proper treatment and care for injuries received on board, is entitled to compensation in damages from the ship.

4. **Seamen ⊜29(2)—Employment of unfit mate constitutes "unseaworthiness" as to seamen.**

    Seaworthiness implies, not alone that the vessel be staunch and sound, but that she be properly manned, and the employment of a mate, known to be unfit, constitutes "unseaworthiness" as to the seamen under him.

    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Unseaworthy.]

In Admiralty. Suit by Demetrius Kohilas, with one Kapstein and others intervening, against the barkentine Rolph; the Rolph Navigation & Coal Company, owner. Decree for libelant and interveners.

H. W. Hutton, of San Francisco, Cal., for libelant.

Sullivan & Sullivan and Theo. J. Roche, of San Francisco, Cal., for respondent.

PARTRIDGE, District Judge. The case of Kohilas v. Barkentine Rolph is before the court upon final submission. The libel is for personal injuries sustained by Kohilas, a sailor, alleged to have been received at the hands of the first mate of the respondent. There were filed intervening libels by one Kapstein, who claims that his hearing was destroyed by the assaults of the first mate, and also by two other sailors named Arnesen and Seppinnen, who claimed assaults, but did not claim any personal injury.

[1] The libels and the evidence in the case have developed a most amazing and dramatic situation. The mate, now admittedly a convict for the brutal treatment of seamen, is described as a giant, weighing in the neighborhood of 285 pounds, all bone and muscle, and with a reputation for ferocity as wide as the seven seas. His treatment of the sailors on various ships on which he was mate was known and discussed wherever seafaring men resort, at least in the Pacific Ocean.

The Rolph commenced her voyage from the port of Vancouver. Hansen, the first mate, signed his shipping articles about three weeks before the vessel sailed, and was on her practically all the time she lay in the

---

harbor of Vancouver. While the ship was in the harbor, Hansen was arrested for a drunken assault upon a number of stevedores, and it appeared by the evidence that his strength was so great that he overcame and put to flight the whole crew of stevedores that was engaged in loading the vessel. The first leg of the voyage was from Vancouver to Melbourne, and the evidence shows that during that trip Hansen assaulted a number of sailors, and beat them to such an extent that upon the arrival of the vessel at Melbourne the crew went to the American consul and secured their release, on the ground of the cruelty of the first mate. I say "the crew," at least the majority of the crew. At Melbourne the master shipped a new crew. That crew was with the vessel until her arrival at Newcastle, and there the crew again left the ship, although this time it does not appear that it was through the cruelty of the mate. A strike was on, and the master shipped almost an entirely new crew at Newcastle, including the libelant and the intervening libelants. The Rolph scarcely cleared the port of Newcastle when the mate commenced his cruel treatment of the seamen. The evidence shows, at least so far as Kohilas and Kapstein were concerned, that the mate was continually beating them with his fist; he struck them on numerous occasions with belaying pins, pieces of scantling, and, on one occasion, he struck Kohilas across the mouth with a bucket and split his lip open. All of these assaults, however, were merely incidental to his main activities, which seem to have been beating the sailors across the head and shoulders with a piece of rope on the end of which was a knot.

As to Kohilas, it appears that finally the mate one evening struck him across the eyes with a knot in a rope, and when he fell to the deck, he continued to rain blows upon his upturned face, and particularly upon his eyes. Kohilas, after the assault, being practically blinded, for the time being at least, went to the master and requested that he be furnished with some kind of medical attention. The evidence shows that in place of receiving treatment, he was driven away with curses and words of vituperation; he was compelled to go ahead with his work, although he was practically nearly blind, and when he was unable to do his work the first mate tied him up by the arm to the wheel of the bilge pump, and if he had not been held up by the other sailors, his arm would certainly have been broken, or probably torn out of the socket.

Upon arrival at Antofagasta, Chile, the sailors all went ashore. They traveled to the home of the American consul, stated to him the fact that they had been repeatedly beaten, and the consul sent for the master, and the master brought the mate to the office of the consul, and the mate was there discharged; but he was not taken into custody by the master and brought in irons to San Francisco, or to an American port for trial, as the statute requires. There, on shore, Kohilas requested again of the master that he be given treatment, medical and surgical, for his eyes, but it was again refused, or at least giving the evidence the most favorable construction to the respondent, it was not granted, and Kohilas did not obtain any attention as to his eyes until he was finally sent back to this port by the American consul in Chile, and was obliged to go to the Marine Hospital here; the result of all of which is he

has lost completely the sight of one eye and is blind in the other eye, to the extent that is is just barely able to walk around, and not able to pursue his calling as a sailor.

The evidence is also complete that Kapstein, as a result of the blows, has lost completely the hearing of one ear.

Some attempt was made by respondent to show that the present condition of Kohilas is syphilitic, and that his blindness was luetic in origin. The evidence, however, to my mind, is perfectly convincing that his condition was not caused or aggravated by that disease, but that as a matter of fact, it was purely traumatic in its origin.

Claim is made, also, that the master of the vessel knew nothing whatever of these assaults. In the first place, the reputation of Hansen was known to seafaring men at least in every port in the Pacific. In the second place, after he was shipped, and before the Rolph sailed out of the port of Vancouver, he committed a drunken assault upon a number of stevedores. So that it is incredible that the master should not know the character of the man at the time that the vessel first sailed.

However that may be, there is no denial of the fact that the crew secured their release at the port of Melbourne because of ill treatment of the first mate. Moreover, the Rolph is a small ship, 230 feet over all, and the distance between the forward part of the poop deck and the after part of the forecastle deck is scarcely 100 feet. The evidence is clear that the master spent most of his time on the forward part of the poop deck, and that there could be the assaults upon these seamen without his seeing them is absolutely incredible. Moreover, the evidence shows that upon one occasion another sailor, not a party to this libel or to the intervening libels, was ill, and I think had been assaulted by the first mate, was forced to go out on the deck at a time when the ship was plunging in heavy seas in a storm, so that in his weakened condition, with the bow of the vessel down in the trough of the sea, he was washed overboard and drowned. To say that the captain did not know it is simply to trifle with this court.

Now, then, I take it that it is of the utmost importance to the manifest destiny of this republic upon the ocean that youth of America should be attracted to the sea. The building up of a merchant marine necessitates a body of seamen and almost universally the class of men who have been shipped on merchant vessels has been high. Sailors on an American ship, therefore, must not be subject to such treatment. It is not alone a question of common humanity, not alone a question even of the award of proper compensation for the natural results of such treatment; it is, besides, a question of the broad policy of this government to foster and extend our merchant marine, and therefore I take it that the courts should not seek to defeat a claim, which, under all the circumstances, would be just, for ill treatment of the seamen, for any technical reason.

[2] It is claimed that the decisions by which the rule that an injured seaman is entitled only to wages, maintenance, and cure, which was modified to permit damages for deliberate assault, has been overruled by the decision of the Supreme Court in the case of The Osceola, 189 U. S. 158, 23 Sup. Ct. 483, 47 L. Ed. 760. In that very case the Supreme Court used this language:

"That the vessel and her owner are, both by English and American law, liable to an indemnity for injuries received by seamen in consequence of the unseaworthiness of the ship."

[3, 4] It is likewise well established that the very principle of ancient maritime law, to the effect that a sailor is entitled only to wages, maintenance, and also cure, carries with it the corollary that, if the cure is not provided to the best ability of the master, the resulting damage must be compensated in a court of admiralty. Requests by Kohilas for treatment were brutally refused. Moreover, in my opinion, the master of the ship violated the statute when he neglected to deliver Hansen, or bring Hansen back to an American port in irons for trial for his crime. But, more than all that, it is perfectly apparent that as to the sailors, the Rolph was not a seaworthy vessel. Seaworthiness, according to all the authorities, not alone implies that the vessel be staunch and sound, but that she shall be properly manned. The leading case in this circuit, of course, is the case of the Rio de Janeiro limitation of liability of the Pacific Mail Steamship Company (130 Fed. 76), in which the Court of Appeals of this circuit held that the Rio de Janeiro was not seaworthy when she sank in the Golden Gate, for the reason that her crew was composed of Chinese who could not speak English, so that when it came to lowering the lifeboats they were unable to understand the orders of the master and the first officer. I therefore hold that the employment of Hansen rendered the Rolph, in so far as the sailors were concerned, an unseaworthy vessel, therefore admiralty rule No. 15 or 16 does not apply at all, and that the decree should be for the libelant and the intervening libelants.

Inasmuch as the injuries were fully set forth in the testimony by medical and other witnesses, the expectation of life and earnings of these men were laid before the court, there is no necessity for a reference to a commissioner in the usual manner.

The decree, therefore, will provide that the judgment be, for Kohilas, in the sum of $10,000; for Kapstein, in the sum of $3,500; for Seppinnen and Arnesen, in the sum of $500.