**In re UNITED STATES.**

**UNITED STATES v. BLACK DIAMOND S. S. CORPORATION.**

**THE FS–231.**

**THE MIDLAND VICTORY.**

Nos. 18301, 18371.

United States District Court E. D. New York.

Feb. 10, 1949.

J. Vincent Keogh, U. S. Atty. for Eastern District of New York, of Brooklyn, N. Y. (Alfred T. Cluff and Frank P. Cox, both of New York City, of counsel), for United States.

Hunt, Hill & Betts, of New York City (John W. Crandall and Robert M. Donohue, both of New York City, of counsel), for Black Diamond S. S. Corporation.

Simon N. Gazan, of New York City (Dominick Blasi, of New York City, of counsel), for claimants.

INCH, Chief Judge.

The Steamship Midland Victory, owned by the United States, under charter to the Black Diamond Steamship Corporation and the U. S. Transport FS-231, collided with each other in the open sea, with substantial damage to each boat, and with loss of life and injury to members of the crew of the Transport FS-231.

I shall hereafter refer to the Midland Victory as the Victory and to the FS-231 as the Transport.

The Transport blames the collision solely on the Victory. The Victory claims the collision was caused by the negligence of the Transport.

The United States also petitions for limitation and exoneration of the Transport. By consent in open court the suits were duly consolidated for the purpose of trial. By the co-operation of counsel, many material facts were not in dispute, as follows: the night of the collision was reasonably clear, with no storm and no wind to amount to anything, visibility was good, for almost half an hour the two ships knew the presence of each other, neither of the ships at any time reduced its speed, the same being full speed ahead until the actual collision, the bow of the Victory struck the starboard side of the Transport close to her stern, that prior to the collision the Victory blew a one-blast signal to the Transport, that the Transport answered by two blasts, thereupon the Victory blew another one-blast signal, and the Transport again crossed this signal with two blasts. In the meantime each vessel was rapidly approaching the other. Shortly thereafter the collision occurred.

There is a dispute about lights on the Transport, but no dispute as to lights on the Victory. There is no dispute that some lights were seen on each vessel, but what they were so far as the Transport is concerned, is not agreed upon.

There is some dispute as to the courses of the respective ships, although it is plain that they were approaching each other in

the open sea. There is no dispute but that the Victory was making eighteen and one-half knots, perhaps a little more, ·and that the Transport was making nine and one-half knots, or perhaps a little more, so that the approach of each ship was rapid, as counsel for the Government estimated, the combined speeds were about twenty-eight hundred feet a minute, "which means the ships were closing in as they were approaching each other at something between seven-eighths of a mile, and one mile, every two minutes".

The main and most important issue relates to liability for the collision between two vessels. The other is the suit for limitation of liability on the part of the Transport.

. We will first take up the main issue.

The Black Diamond Steamship Corporation was operating, at the time in question, the steamship Midland Victory owned by the United States of America, and under a charter from the War Shipping Administration to it. The other vessel in the collision was the U. S. Transport FS–231, which was operated by the United States acting through the Army Transportation Corporation. The collision occurred in the Atlantic Ocean approximately at 11:30 P.M. on the night of August 24, 1946, about twelve miles from shore, at a point somewhat to the eastward of Fire Island Light buoy. The bow of the steamship Midland Victory (which I have referred to as the Victory) crashed at full speed into the stern of the Transport FS–231 (which I have referred to as the Transport). The result was most serious, several men on the Transport were killed, and others are alleged to have been injured. Both boats were substantially injured. The Victory was coming to New York from Rotterdam, the Transport was leaving New York for Newfoundland. The Black Diamond filed a libel in this Court against the United States under the Public Vessels Act, 46 U.S.C.A. § 781, for damages sustained by the Victory. The United States filed a cross-libel against the Black Diamond for damages sustained by the Transport. As usual, each claims that the other ship was solely to blame. Considerable testimony has been taken, a great deal of which is contained in depositions. Much stress is laid in the testimony upon courses, rules, and many other things, all of which has required of this Court time to carefully read the depositions to be sure that nothing has been overlooked.

It seems to me, however, that the negligent navigation of these vessels is not so much dependent here on courses and similar matters, important as they may be in other cases, as it is on what those in control of each vessel saw, or carelessly omitted to see, or carelessly did, in the fifteen minutes or so prior to the collision, when the vessels were about three miles apart and then rapidly meeting, each proceeding at full speed, the Victory at eighteen and one-half knots, which was never reduced, and the Transport at approximately nine and one-half knots, which likewise was not reduced, so that the total speed was in the neighborhood of approximately twenty-eight knots, making this closing space between them quite rapid.

The Victory is a large steamship about 455 feet long and 62 feet wide, 7600 gross tons, carrying cargo, the Transport is a much smaller vessel, about 175 feet long and of much slower speed. To make matters worse, while the Master and crew of the Victory were experienced seamen, the Master and crew of the Transport, from the testimony I have read and heard, were neither competent nor experienced. This cannot absolve, however, those in charge of the Victory, for it was all the more important that they, as experienced seamen, exercise the reasonable care plainly necessary to prevent this collision in spite of the carelessness and inexperience of those in charge of the Transport.

Counsel for the Victory claim that the Transport was entirely to blame for the collision because she was improperly manned, failed to display proper side lights, was not on a proper course, that she went to port instead of starboard as the vessel approached, and carelessly attempted to cross the bow of the Victory, in spite of the signals from the Victory. That the Victory was blameless because she went to starboard shortly before the collision, that she kept full speed in order to avoid such collision, that if the situation

did become a crossing one, hers was only a minor fault, and her navigation was proper.

Counsel for the Transport goes to the other extreme and claims that it was blameless, that her side lights and other lights were all burning brightly, and could have been seen by proper observation, that the officers on the Victory were not attentive, that the Victory was grossly at fault by going to the right when the Transport was going to her left, and that the Victory was guilty of these and other contributive faults, such as an incompetent lookout, failure to heed the warning of the constant bearing of the white light, running at full speed in disregard of her duty as an overtaking vessel, which, according to the testimony of the Captain of the Victory he stubbornly insisted was the situation, and in failure to give signals of her change of course, etc.

█ It is not unusual to find in cases of such collisions that what those in charge of the vessels saw, did, or omitted to do, in the ten or fifteen minutes just prior to the collision furnishes the best foundation for determining liability rather than discussion and expert testimony as to courses, general navigation and such other matters that would offer material aid in other cases where the evidence is different from that plainly established here. The various Rules governing navigation should, of course, be consulted (Title 33 U.S.C.A. § 103 et seq.), but the very purpose of these Rules is aimed at safety and avoidance of collision. As Chief Judge Learned Hand has well stated: "If in doubt as to whether the other ship was converging or parallel, she was bound to assume the first; ambiguities must be resolved in favor of safety. * * * A constant bearing is a sure sign of danger, made so by the rules at their very outset; a danger signal which should put every mariner on guard. To be sure, it may not call for an immediate change of course or speed, but it must always be remembered that it is the risk of collision, not the collision itself, that masters must avoid." Ocean S. S. Co. of Savannah v. United States, 2 Cir., 38 F.2d 782, 784.

After careful consideration of all the evidence it is my opinion that the Master of the Victory and the Master of the Transport were each careless and that it is this joint negligence that brought about the collision.

In making this decision I have concentrated on the period of time before the collision, a matter of ten or fifteen minutes, when the Master of the Victory returned to the bridge of the Victory, and the two vessels were approaching each other at a joint speed of some twenty-eight knots over a distance of approximately three miles. As I have indicated above, there is a great deal of testimony about other things, but a few excerpts from the testimony of several of the important witnesses may be cited.

First, those on the Transport, Sutherland, an unlicensed man, said that he was on watch until 10 o'clock that night, and that he saw the red and green lights of the Transport were lit. That he was a poor helmsman and the Transport would veer from one side to the other, that when the Transport would go off her course the third mate, Jesnes, another unlicensed man, would take the wheel and bring her back, that he left and went below about 11:15; Jesnes, the third mate, also said he saw the red and green lights of the Transport burning, that about twenty-five minutes before the collision the Master gave him an order to change the course of the Transport to the left, that he heard two blasts from the Transport, Olivey, first officer of the Transport was not on duty but he said that the red and green lights of the Transport were burning, and that he heard the Transport sound what seemed to him to be "a two-blast signal". Ragette, another unlicensed man, was second officer of the Transport and he said: "I heard a one-blast signal from the Victory then the collision. I was off duty".

Reilley, who is called an AB seaman, but whether he was licensed does not plainly appear, testified: "I was acting as lookout, about 11:15 I saw the white light of the Victory and about twenty minutes before the collision it was dead ahead, the white light seemed to be going a little over

to our starboard, I observed a green light of the Victory, we blew first and then the Victory blew".

Petterson, Master of the Transport, had no license. He was on the bridge until after the collision. "The Victory was about dead ahead a little on our right, we were about eighteen miles from each other, when we were about twelve miles apart I saw the Victory's green light, my helmsman was not steering too good so the third mate relieved him, then the course of the Victory appeared to change some, when we were about four or five miles apart the Victory then sounded a one-blast signal, I sounded two blasts, the Victory again sounded a one-blast signal, I again answered with two blasts and went to the left, then I observed the Victory swinging to our right, she was trying to cross our course to the right, and I figured as long as I stayed in clear water, that is the best thing I can do, the Victory was about half a mile away when he blew his one-blast signal and he started to go to our left. We were pretty close together when the Victory blew a second blast. I was intending to change back as soon as we passed the Victory. I blew no danger signals. I felt I had a right to go left as the Victory was so far off".

In substance it seems to be plain that not only did the Master of the Transport negligently cross the signals of the Victory, but attempted to cut across her bow in the hope that he could get around the Victory and resume his course afterwards. I do not think that a clear consideration of all the testimony would fail to find that the Transport in control of these inexperienced and unlicensed men was grossly negligent. However, in spite of this the Victory cannot be absolved, although her counsel argued that if anything hers was such a minor fault that it should be ignored. On the contrary, I think that, although she was being guided by experienced men, they not only were careless, but neglected to do that which would undoubtedly have prevented this accident. When her signal was crossed by the Transport, the Victory should have slowed down, or even reversed until the confusion passed. As it was, the collision was at the extreme stern of the Transport, and but a little prior care would have avoided it entirely.

Goley, an AB sailor, of ten years experience, was lookout on the bow of the Victory at the time when Captain Amy came back on the bridge. Goley says that when they were about one thousand yards away he saw a single mast light of the Transport and that he rang three bells to indicate light dead ahead, about eight minutes before the collision he again rang three bells to indicate the light dead ahead, and when they were about two hundred yards, he again rang three bells, that the Victory did not slow down, that the mate was busy communicating with another ship from the bridge, that when they were about three hundred yards apart, he saw the red and green lights of the Transport plainly, that the Transport was approximately dead ahead, at first the white light of the Transport had been slightly on the left, then it became dead ahead, then he saw the red and green lights of the Transport, about one hundred yards away the Transport crossed our bow.

There is some testimony about Goley having trouble with Captain Amy on a previous trip, but this does not seem to be important, and Goley said that Captain Amy was a good Captain.

Amy said that he returned to the bridge approximately fifteen minutes before the collision, that Cordwell was then the officer on watch, and that Goley was the lookout, that when he came on the bridge Cordwell reported that the Victory was overtaking a vessel on our port bow. "I looked and could only see the white light and thought it was some vessel we were overtaking. Then I saw the white light suddenly swing to our right and cross our course, so I sounded one blast and ordered the wheel hard right. The Transport answered me with two blasts, I heard no other signals from the Transport. After the collision I saw the red lights of the Transport. I had returned to the bridge about nine minutes before the collision, we were then about three or four miles apart. I thought it was a stern light of a vessel we were overtaking, we were closing slowly on the light, we did not slow down, after I had given

two one-blast signals, I still thought we were overtaking the Transport. I could have stopped, we would go about a mile before coming to a halt at my speed, we were going full speed when we hit. My first signal indicated I was altering my course. Cordwell reported to me that he had watched the light for about twenty minutes, I thought we were overtaking the Transport".

Cordwell, third mate, a licensed man, said that Wolfe, an AB sailor, was at the wheel, that Goley had taken his place as lookout about 10 o'clock, then Connolly took his place until 11, then Goley resumed as lookout until the collision, "that about 11 o'clock I saw a single white light ahead, also the lookout saw it, this light was then slightly on our left, then I received a signal from the lookout, two bells, I don't recall ever having heard three bells, I never saw the side lights of the Transport, I assumed that this white light was a stern light of the Transport which we were overtaking. It was getting brighter, and I changed our course slightly to the right; at 11:20 the Captain came on the bridge, I pointed out the light and told him that I was overtaking the vessel, the Captain changed the course still further to our right, and we proceeded seven or eight minutes, all of a sudden the white light started to close in on our bow, I still assumed it was an overtaking vessel, I blew one blast, I heard none from the other vessel, in half a minute I gave another blast and went hard right, I heard no whistle from the other vessel, a few seconds before the collision I saw the outline of the Transport, I still could not see any red or green lights, I proceeded with caution for I assumed we were overtaking the Transport. Caution means stop and then proceed when you understand the situation. We did not stop nor slow down, we were less than five miles apart when I saw the white light of the Transport closing in on our bow, perhaps it was two miles, when we were about a mile apart we went hard right, I was carrying out the orders of the Captain, the Captain had given the fog signal before the collision.

Wolfe—"I was steering the Victory before the collision, I saw the white light of the Transport probably five to eight miles away, I saw no red or green light, but ten minutes before the collision I changed my course by order of the third mate, we blew a long blast, then I received an order of hard right, I was scared and excited. I believe I did say at the Coast Guard hearing that the white light stayed almost exactly the way it was from the very beginning, and I thought the Transport was coming our way. Sometimes I could not make out what the Transport was doing."

Assuming that some of the inconsistencies of this testimony of witnesses is considered, I think it is sufficiently plain that those in charge of the Victory, if they had been reasonably attentive and observant, could have seen in plenty of time that it was careless to proceed full speed ahead, and rely simply upon the blowing of whistles. See National Motorship Corp. v. United States, 2 Cir., 171 F.2d 413.

I am satisfied that the red and green lights of the Transport were lit, and on such a night as this, which was clear and visibility good, they could have been seen at least two miles away, that, even assuming that Captain Amy and Cordwell had jumped to the conclusion that they were overtaking a vessel, it was careless navigation not to proceed with reasonable caution by stopping, or at least slowing down their approach, which, if such course had been followed, would have avoided the collision with this also negligently operated Transport.

The situation for some time before the collision, called plainly for this exercise of care on the part of those in charge of the Victory. By inattention and stubborn holding to their conclusion that they were overtaking the Transport, this neglect was more than a minor fault which could be overlooked in view of the fault of the Transport.

The conclusion, therefore, I reach is that this collision, with its serious results, was the result of the joint carelessness of those in charge of the Transport and of the Victory.

We now come to the other issue, the application of the Government, as owner

of the Transport, for Limitation of Liability.

My conclusion has not been reached without difficulty. At the outset, due regard should be given to a situation when this nation was actually engaged in a great War. Apparently this situation was thought by certain witnesses for the Government to be an excuse for what was done, but it seems plain to me that the actual War had, in fact, been terminated over a year before this Transport was sent out. It was also testified to that this manner in which crews were selected for this Transport and similar vessels continued up to even during 1948. While consideration should be given to a situation in which the Government nevertheless found itself, the necessary hurry and haste prevalent when a war was actually on, does not seem sufficient to excuse a method pursued by the Government in what was, substantially, peaceful times.

Passing, therefore, to the facts, we find that the Transport was sent out on the open sea to encounter not only the perils of same, but also the danger to the crew of ignorant and careless navigation. The Master of the Transport was not licensed, and certainly was careless. This sufficiently appears from what he did when faced with the on-coming Victory. He was in charge of the Transport and the lives of his crew. He deliberately and repeatedly crossed the signals of the Victory, and then endeavored to cross the bow of the Victory, hoping to get the Transport around the Victory and again on her course.

With the exception of one sailor, the rest of his selected officers were inexperienced and unlicensed, and in fact their qualifications, other than being willing, appear to have been unknown to the Master. He himself was unlicensed, with a past experience which does not measure up to the command of a vessel like the Transport in the open sea.

■ Of course, the Government, the same as any other owner of a vessel, would, under proper circumstances, be entitled to limit its liability if the evidence showed that the collision occurred without its Privity and Knowledge. Nevertheless,

a duty exists which is often discussed under the title of Seaworthy, "that the vessel shall be equipped to perform the duty which she owes to the human beings aboard of her and the cargo which she carries". Adams v. Bortz, 2 Cir., 279 F. 521, 523; The Rolph, D.C., 293 F. 269; In re Pacific Mail S. S. Co., 9 Cir., 130 F. 76, 69 L.R.A. 71; The Framlington Court, 5 Cir., 69 F.2d 300.

The duty, therefore, rested upon the Government to send the Transport into the open sea with a competent and experienced Master and a crew, of which at least, her officers should be competent, experienced, and with knowledge of the rules and navigation.

■ I do not think that this duty of proper selection was performed as to this Transport. Whether or not she was, therefore, "unseaworthy", may or may not be the fact, as that term is a relative term, and takes into consideration many circumstances as to which we may or may not be concerned with, but the Government, in order to show that it is entitled to limitation, presented the deposition of Captain Torning, who, in August, 1948, was the Marine Superintendent at the Port of Embarkation, New York, and also the deposition of Captain Clarke, who at that time was Port Captain, with reference to small craft; also there was offered in evidence, the Rules and Regulations issued by the Chief of Transportation at Washington, D. C., pertaining to the crewing of army transport vessels, and setting forth the policy to be followed. In substance, these Rules, etc., amounted to direction to those actually in charge of getting the crew for this Transport, to recruit licensed or certificated marine personnel wherever possible. If such personnel were not available, due consideration should be given to applicants who were otherwise qualified to fill the position in question, whether or not they were licensed or have seaman's papers.

It was also provided that Port Commanders should have the closest possible liaison between the personnel office charged with recruiting and the Water Division charged with operation of the vessel. So much for these instructions from Washington. Nev-

ertheless, it appears that the Master of the Transport was selected as Master without a license and, with only the slightest sort of proof that he might be competent to go to sea in charge of the Transport.

So far as the evidence goes, this man, while he was known in a sort of indefinite way to the two officers above mentioned, and considered by them to be sober and industrious, was the only member of the crew that they personally knew about. The remainder of the crew was selected by the so-called Crewing Section, who, so far as the evidence goes, accepted them for this duty of going to sea in about the same manner as one would "shape" up a gang of men along the waterfront.

There is nothing to show what examination was ever given them, yet some of them became "officers", and the above witnesses, in charge generally, testified that they knew nothing about the inaction of this Crewing Section. They relied upon the Master, who selected the officers, and trusted that the Master would complain to them if he was not satisfied, yet the Master has stated that he did not know anything about the qualifications of these men, except that some of them knew little or nothing about navigation.

Captain Torning testified in his deposition, that he would not consider those lacking the knowledge of those who became such officers, to be qualified, but his excuse was that "We did a lot of those things during the War", and on cross-examination, he testified "When you can't get any other man and the vessels have to move, we had to do a lot of things during the War that were not in accordance with the rules and regulations, but we did it".

The actual War had ended a year before this occurred, and as I have said, the condition of necessity which might have occasioned some disobedience to the rules and regulations seems to have continued up through 1948. One of the reasons for this selection of unlicensed men without proper examination seems to be that, according to Captain Clarke, "it was really hard to get them for these FS boats because of the difference in pay".

However this may be, and with due regard to this action of the different personnel endeavoring to get a crew so that the Transport could leave, it did put to sea improperly manned to an extraordinary degree.

■ The next and final question to be answered is, assuming all the above to be true, has the Government, since it has shown such Rules and Regulations to govern the hiring of the crew, sufficiently indicated that the actual hiring was not with its privity or knowledge. The Government relies to some extent upon the case of La Bourgogne, 210 U.S. 95, 28 S.Ct. 664, 52 L.Ed. 973. I shall assume that by this proof the claimants have the burden of proving that the rules were wilfully departed from, which departure was brought to the knowledge, or knowingly acquiesced in by the representatives of the Government. This was what was required in the La Bourgogne matter. On this question of privity and knowledge, many cases depend on many different facts in each case. In some cases involving actual owners, limitation was allowed, and some not allowed. See Coryell v. Phipps, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363. In cases of corporations, limitation was refused where a works manager and representative of the company was negligent and disregarded directions given him. Spencer Kellogg & Sons v. Hicks, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903.

■ In this case before me, it seems to me that the claimants have borne their burden of proof by showing that in spite of the rules and regulations which, while they directed licensed or certificated marine personnel be employed, but if same were not available, due consideration should be given to applicants who were otherwise qualified, that this apparent failure to investigate to some reasonable degree the qualifications of those employed, all was within the scope of authority given to the representatives of the Government to use proper supervision over such men to be employed, and that the evidence shows that it was not done in this case, and the fair inference exists that it was known to the Govern-

ment, and was quite customary, because of the smallness of pay, the necessity to get some sailors, and for other reasons that seem to indicate that the easiest way took less time and trouble, to make this sort of careless selection of the crew on this Transport, and therefore all of this was within the privity and knowledge of the Government.

Accordingly, the petition to limit liability is denied.

Submit usual decree, with proposed findings of fact and conclusions of law.