## THE ROBERT C. McQUILLEN.

### (District Court, D. Connecticut. January 21, 1899.)

#### No. 1,131.

1. MASTER AND SERVANT—INJURY TO SEAMAN—CONTRIBUTORY NEGLIGENCE.
   A seaman who, contrary to express orders, places himself in a position where he is liable to injury from the giving way of a rope, which is so rotten that its unsafe condition is obvious, is guilty of negligence contributing to an injury so received.[1]

2. SAME—ASSUMED RISK.
   The risk to a seaman of injury from perils of navigation, from the negligence of fellow servants, or from defects in tackle or other appliances, which are not obvious or discoverable by the exercise of reasonable care, is incidental to the employment, and is assumed by him.

This was a libel in rem by Louis Johnson against the schooner Robert C. McQuillen, her tackle, etc., to recover for personal injuries received by libelant while serving as a seaman on such vessel.

Samuel H. Park, for libelant.

Deforest & Klein, for claimants.

TOWNSEND, District Judge. On the 3d day of September, 1895, the libelant was a seaman on the three-masted schooner Robert C. McQuillen. In the afternoon of said day, when the schooner was in the Gulf Stream, off the North Carolina coast, on her return voyage from Darien, Ga., to the port of New York, the order was given to reef the mainsail. It was storming at the time. There was a heavy sea on, and the vessel was lurching and rolling heavily, and had fallen off a point or two from her course. James Krouse, the first mate, who was then in charge of the deck, directed libelant, while the mainsail was being lowered, to get the reefing tackle. In order to reach said tackle, libelant, instead of going around the end of the main boom, as he should have done, attempted to crawl under it, when the lift which supported it parted, and the boom fell on his back, causing a concussion of the spine, and so bruising him that it was necessary to put in to Wilmington and to take him to the hospital.

The libelant claims $10,000 damages. I find that his injuries, al-

---

[1] See note to Wm. Johnson & Co. v. Johansen, 30 C. C. A. 678, as to negligence of both master and servant.

though they were severe, and required treatment during several months, were not of a permanent character, and that the damages therefrom did not exceed the sum of $1,000. I also find, upon the testimony of libelant's witnesses, that he was guilty of contributory negligence; because, inter alia, they assert or admit that the rope was so rotten that its dangerous condition was apparent to everyone, that the libelant knew its condition, and that he voluntarily crawled under the boom contrary to express orders. The Tammerlane, 47 Fed. 822.

The single remaining question in the case is whether the lift supporting the boom was so defective, by reason of an old, weak, and rotten rope, as alleged in the libel, that the claimants are liable for negligence in its use. The portion of the lift which parted was a halliard of Manila rope, which ran from a block in the mizzen mast to a pin in the rail above the deck on the port side, near the forward shroud of the mizzen rigging. On the end of the main gaff there was an iron band with a square edge. The preponderance of testimony indicates that the accident was caused by the gaff swaying, by reason of the heavy sea, when it was in a horizontal position, and at such a height that said iron band on the end of the gaff struck forcibly against said lift and parted it. There is some testimony to the contrary, however, and it is not necessary to decide this question, because the claim of defective construction of the boom and lift was abandoned in open court after the taking of additional testimony.

The rope was of proper size, and was only occasionally used, and then only to support the boom while the sail was being reefed. At the point where it parted it was not ordinarily exposed to friction or wear and tear. It appears from libelant's own witnesses that the construction of the lift was the usual one in such vessels, and that the rope was of the ordinary size. The testimony of the captain, of the first mate, and of another captain who sailed the vessel after the accident, is to the effect that they examined the rope before and after the accident, that it was in good condition, and that it was spliced and used for six months after the accident. Capt. Randall, a competent and disinterested witness on behalf of the libelant, says that, as long as the lift tackle looks fairly well, it is not necessary to change it, but that ordinarily it becomes chafed in from six months to a year or two years, when it should be renewed. It does not appear that said rope showed any signs of being chafed, and it does affirmatively appear that it had been renewed within a year. The other evidence on behalf of the libelant consists of the testimony of four fellow countrymen, not technically interested, but manifestly bound together by mutual sympathy and prejudice. Their testimony is so full of contradictions and inconsistencies, as to vital and material points, that it should be discredited. It is manifestly insufficient to show negligence on the part of claimants. The testimony of Thompson, on behalf of libelant, is so patently absurd that I have disregarded it. The following citation from his testimony will sufficiently indicate its character: "I talked with Johnson, the libelant, the same day of the accident, in the forenoon. I said that 'the rope is not good enough to be there; if you come to lower down the sail, the boom will come

on the lift, and then somebody will crawl underneath the boom, and the boom will fall down on somebody.'" That the rope was 'not rotten is testified to by the three witnesses for the claimants, and is suggested by the fact that Gunderson, a witness for libelant, who spliced the rope, rove in a new piece, and connected the old piece on below the splice. As already stated, there is no evidence that it was chafed. That the witnesses for libelant are not accurate in their recollection of the facts further appears from the contradictions in their testimony as to what was done with the rope after the accident. Thompson's testimony as to the condition of the rope is further discredited by the statement that he took part of it away to show how rotten it was, and afterwards lost it. The contention of the libelant, that the failure of the claimants to produce the rope in court raises the presumption that it would have told against them, is deprived of much of its force by reason of the laches of the libelant. Although the injuries were received on the 3d day of September, 1895, the libel was not filed until the 4th day of September, 1896, and no notice was given to the claimants that any claim would be made against the vessel. Meanwhile the rope had been used constantly, until it wore out, and was discarded some six months after the accident. In these circumstances, I find that the rope was not old, weak, or rotten, and that, even if it were in a defective condition, such defective condition was not obvious or discoverable by the exercise of reasonable care.

The following uncontradicted testimony of Capt. Krouse on his cross-examination suggests a further and substantial defense to this action:

"Q. 2. Then why, upon this occasion, was the sail lowered in this way, whereby it made it dangerous for those engaged in it? A. Probably the men that lowered it didn't do it fast enough. Two men were lowering that sail. They didn't look at the sail. If they lower it down, it makes a peak in that angle. If they lowered the peak a little lower, it will clear it. Just happened to be on the exact position to hit that rope."

Inasmuch as it appears that this condition was due to the negligence, not of the acting master, but of the fellow servants of the libelant, and as the suggestion of unseaworthy construction is specifically disclaimed, the ship would not be liable under the settled rule. The City of Alexandria, 17 Fed. 390.

The evidence, taken as a whole, further supports the theory that the falling of the boom, in these circumstances, was the result of one of those perils of the sea for which the ship would not be liable. Libelant's witness Randall says such a striking of the gaff against the lift tackle is incident to, and one of the ordinary perils of, navigation in bad weather, which could not be avoided. Capt. Blake, in open court, with the aid of a model, further showed how, when the vessel was pitching and rolling, the play of the lift tackle might permit the gaff, when in a horizontal position, to come in contact with the lift tackle, when at other times it would be clear. Whether this accident arose from one of the perils of navigation, or from the negligence of fellow servants, or from a defect in said lift which was not obvious or discoverable by the exercise of reasonable care, the risk of such injury was one incidental to libelant's employment, and assumed by him,

and for the consequences of which the vessel is not liable. The Concord, 58 Fed. 913; The France, 8 C. C. A. 185, 59 Fed. 479. The libel is dismissed.