(Slip Opinion) OCTOBER TERM, 2018 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## DUTRA GROUP *v.* BATTERTON

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 18–266. Argued March 25, 2019—Decided June 24, 2019

Respondent Christopher Batterton was working on a vessel owned by petitioner Dutra Group when a hatch blew open and injured his hand. Batterton sued Dutra, asserting a variety of claims, including unseaworthiness, and seeking general and punitive damages. Dutra moved to dismiss the claim for punitive damages, arguing that they are not available on claims for unseaworthiness. The District Court denied Dutra's motion, and the Ninth Circuit affirmed.

*Held*: A plaintiff may not recover punitive damages on a claim of unseaworthiness. Pp. 10–19.

(a) This case is governed by *Miles* v. *Apex Marine Corp.*, 498 U. S. 19, and *Atlantic Sounding Co.* v. *Townsend*, 557 U. S. 404. *Miles* establishes that the Court "should look primarily to . . . legislative enactments for policy guidance" when exercising its inherent common-law authority over maritime and admiralty cases, while recognizing that such statutory remedies may be supplemented to "achieve the uniform vindication" of the policies served by the relevant statutes. 498 U. S., at 27. And in *Atlantic Sounding*, the Court allowed recovery of punitive damages but justified that departure from the statutory remedial scheme based on the established history of awarding punitive damages for certain maritime torts, including maintenance and cure. 557 U. S., at 413–414. P. 10.

(b) The overwhelming historical evidence suggests that punitive damages are not available for unseaworthiness claims. Neither *The Rolf*, 293 F. 269, nor *The Noddleburn*, 28 F. 855—on which Batterton relies—contains a relevant discussion of exemplary or punitive damages. And two other cases to which Batterton points—*The City of Carlisle*, 39 F. 807, and *The Troop*, 118 F. 769—both involve maintenance and cure, not unseaworthiness, claims. The lack of punitive

damages in traditional maritime law cases is practically dispositive. Pp. 11–13.

(c) This Court cannot sanction a novel remedy here unless it is required to maintain uniformity with Congress's clearly expressed policies, particularly those in the Merchant Marine Act of 1920 (Jones Act)—which codified the rights of injured mariners by incorporating the rights provided to railway workers under the Federal Employers' Liability Act (FELA). Early decisions held that FELA damages were strictly compensatory. See, *e.g.*, *American R. Co. of P. R.* v. *Didricksen*, 227 U. S. 145, 149. And the Federal Courts of Appeals have unanimously held that punitive damages are not available under FELA. This Court's early discussions of the Jones Act followed the same practices, see, *e.g.*, *Pacific S. S. Co.* v. *Peterson*, 278 U. S. 130, 135, and lower courts have uniformly held that punitive damages are not available under the Jones Act. Adopting Batterton's rule would be contrary to *Miles*'s command that federal courts should seek to promote a "uniform rule applicable to all actions" for the same injury, whether under the Jones Act or the general maritime law. 498 U. S., at 33. Pp. 13–15.

(d) Batterton argues that punitive damages are justified on policy grounds or as a regulatory measure. But unseaworthiness in its current strict-liability form is this Court's own invention and came after passage of the Jones Act, and a claim of unseaworthiness serves as a duplicate and substitute for a Jones Act claim. It would, therefore, exceed the Court's objectives of pursuing policies found in congressional enactments and promoting uniformity between maritime statutory law and maritime common law to introduce novel remedies contradictory to those provided by Congress in similar areas. Allowing punitive damages on unseaworthiness claims would also create bizarre disparities in the law. First, due to *Miles*'s holding, which limited recovery to compensatory damages in wrongful-death actions, a mariner could make a claim for punitive damages if he was injured onboard a ship, but his estate would lose the right to seek punitive damages if he died from his injuries. Second, because unseaworthiness claims run against the owner of the vessel, the owner could be liable for punitive damages while the ship's master or operator—who could be more culpable—would not be liable for such damages under the Jones Act. Finally, allowing punitive damages would place American shippers at a significant competitive disadvantage and discourage foreign-owned vessels from employing American seamen. The maritime doctrine mentioned by Batterton, which encourages special solicitude for the welfare of seamen, has its roots in the paternalistic approach taken toward mariners by 19th century courts and has never been a commandment that maritime law must favor seamen

whenever possible. Pp. 15–18.

880 F. 3d 1089, reversed and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, KAGAN, GORSUCH, and KAVANAUGH, JJ., joined. GINSBURG, J., filed a dissenting opinion, in which BREYER and SOTOMAYOR, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 18–266

———————

## THE DUTRA GROUP, PETITIONER *v.* CHRISTOPHER BATTERTON

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 24, 2019]

JUSTICE ALITO delivered the opinion of the Court.

By granting federal courts jurisdiction over maritime and admiralty cases, the Constitution implicitly directs federal courts sitting in admiralty to proceed "in the manner of a common law court." *Exxon Shipping Co.* v. *Baker*, 554 U. S. 471, 489–490 (2008). Thus, where Congress has not prescribed specific rules, federal courts must develop the "amalgam of traditional common-law rules, modifications of those rules, and newly created rules" that forms the general maritime law. *East River S. S. Corp.* v. *Transamerica Delaval Inc.*, 476 U. S. 858, 864–865 (1986). But maritime law is no longer solely the province of the Federal Judiciary. "Congress and the States have legislated extensively in these areas." *Miles* v. *Apex Marine Corp.*, 498 U. S. 19, 27 (1990). When exercising its inherent common-law authority, "an admiralty court should look primarily to these legislative enactments for policy guidance." *Ibid.* We may depart from the policies found in the statutory scheme in discrete instances based on long-established history, see, *e.g.*, *Atlantic Sounding Co.* v. *Townsend*, 557 U. S. 404, 424–425 (2009), but we do so

cautiously in light of Congress's persistent pursuit of "uniformity in the exercise of admiralty jurisdiction." *Miles*, *supra*, at 26 (quoting *Moragne* v. *States Marine Lines, Inc.*, 398 U. S. 375, 401 (1970)).

This case asks whether a mariner may recover punitive damages on a claim that he was injured as a result of the unseaworthy condition of the vessel. We have twice confronted similar questions in the past several decades, and our holdings in both cases were based on the particular claims involved. In *Miles*, which concerned a wrongful-death claim under the general maritime law, we held that recovery was limited to pecuniary damages, which did not include loss of society. 498 U. S., at 23. And in *Atlantic Sounding*, after examining centuries of relevant case law, we held that punitive damages are not categorically barred as part of the award on the traditional maritime claim of maintenance and cure. 557 U. S., at 407. Here, because there is no historical basis for allowing punitive damages in unseaworthiness actions, and in order to promote uniformity with the way courts have applied parallel statutory causes of action, we hold that punitive damages remain unavailable in unseaworthiness actions.

I

In order to determine the remedies for unseaworthiness, we must consider both the heritage of the cause of action in the common law and its place in the modern statutory framework.

A

The seaman's right to recover damages for personal injury on a claim of unseaworthiness originates in the admiralty court decisions of the 19th century. At the time, "seamen led miserable lives." D. Robertson, S. Friedell, & M. Sturley, Admiralty and Maritime Law in the United States 163 (2d ed. 2008). Maritime law was largely judge-

made, and seamen were viewed as "emphatically the wards of the admiralty." *Harden* v. *Gordon*, 11 F. Cas. 480, 485 (No. 6,047) (CC Me. 1823). In that era, the primary responsibility for protecting seamen lay in the courts, which saw mariners as "peculiarly entitled to"— and particularly in need of—judicial protection "against the effects of the superior skill and shrewdness of masters and owners of ships." *Brown* v. *Lull*, 4 F. Cas. 407, 409 (No. 2,018) (CC Mass. 1836) (Story, J.).[1]

Courts of admiralty saw it as their duty not to be "confined to the mere dry and positive rules of the common law" but to "act upon the enlarged and liberal jurisprudence of courts of equity; and, in short, so far as their powers extend[ed], they act[ed] as courts of equity." *Ibid.* This Court interpreted the Constitution's grant of admiralty jurisdiction to the Federal Judiciary as "the power to . . . dispose of [a case] as justice may require." *The Resolute*, 168 U. S. 437, 439 (1897).

Courts used this power to protect seamen from injury primarily through two causes of action. The first, maintenance and cure, has its roots in the medieval and renaissance law codes that form the ancient foundation of maritime common law.[2] The duty of maintenance and cure

_____

[1] Riding circuit, Justice Story described mariners in markedly paternalistic terms:

"Seamen are a class of persons remarkable for their rashness, thoughtlessness and improvidence. They are generally necessitous, ignorant of the nature and extent of their own rights and privileges, and for the most part incapable of duly appreciating their value. They combine, in a singular manner, the apparent anomalies of gallantry, extravagance, profusion in expenditure, indifference to the future, credulity, which is easily won, and confidence, which is readily surprised." Brown, 4 F. Cas., at 409.

[2] A right resembling maintenance and cure appears in the Laws of Oleron, promulgated by Eleanor of Aquitaine around 1160, in the 13th-century Laws of Wisbuy, in the Laws of the Hanse Towns, published in 1597, and in the Marine Ordinances of Louis XIV, published in 1681.

requires a ship's master "to provide food, lodging, and medical services to a seaman injured while serving the ship." *Lewis* v. *Lewis & Clark Marine, Inc.*, 531 U. S. 438, 441 (2001). This duty, "which arises from the contract of employment, does not rest upon negligence or culpability on the part of the owner or master, nor is it restricted to those cases where the seaman's employment is the cause of the injury or illness." *Calmar S. S. Corp.* v. *Taylor*, 303 U. S. 525, 527 (1938) (citations omitted).

The second claim, unseaworthiness, is a much more recent development and grew out of causes of action unrelated to personal injury. In its earliest forms, an unseaworthiness claim gave sailors under contract to sail on a ship the right to collect their wages even if they had refused to board an unsafe vessel after discovering its condition. See, *e.g., Dixon* v. *The Cyrus*, 7 F. Cas. 755, 757 (No. 3,930) (Pa. 1789); *Rice* v. *The Polly & Kitty*, 20 F. Cas. 666, 667 (No. 11,754) (Pa. 1789). Similarly, unseaworthiness was a defense to criminal charges against seamen who refused to obey a ship master's orders. See, *e.g., United States* v. *Nye*, 27 F. Cas. 210, 211 (No. 15,906) (CC Mass. 1855); *United States* v. *Ashton*, 24 F. Cas. 873, 874–875 (No. 14,470) (CC Mass. 1834). A claim of unseaworthiness could also be asserted by a shipper to recover damages or by an insurer to deny coverage when the poor condition of the ship resulted in damage to or loss of the cargo. See *The Caledonia*, 157 U. S. 124, 132–136 (1895) (cataloging cases).

Only in the latter years of the 19th century did unseaworthiness begin a long and gradual evolution toward

─────────

See 30 F. Cas. 1169 (collecting sources). The relevant passages are the Laws of Oleron, Arts. VI and VII, 30 F. Cas., at 1174–1175; the Laws of Wisbuy, Arts. XVIII, XIX, and XXXIII, 30 F. Cas., at 1191–1192; the Laws of the Hanse Towns, Arts. XXXIX and XLV, 30 F. Cas., at 1200; the Marine Ordinances of Louis XIV, Tit. IV, Arts. XI and XII, 30 F. Cas., at 1209.

remedying personal injury.  Courts began to extend the cases about refusals to serve to allow recovery for mariners who were injured because of the unseaworthy condition of the vessel on which they had served.[3]  These early cases were sparse, and they generally allowed recovery only when a vessel's owner failed to exercise due diligence to ensure that the ship left port in a seaworthy condition. See, *e.g.*, *The Robert C. McQuillen*, 91 F. 685, 686–687 (Conn. 1899); *The Lizzie Frank*, 31 F. 477, 480 (SD Ala. 1887); *The Tammerlane*, 47 F. 822, 824 (ND Cal. 1891).

Unseaworthiness remained a suspect basis for personal injury claims until 1903, when, in dicta, this Court concluded that "the vessel and her owner are . . . liable to an indemnity for injuries received by seamen in consequence of the unseaworthiness of the ship."  *The Osceola*, 189 U. S. 158, 175 (1903).  Although this was the first recognition of unseaworthiness as a personal injury claim in this Court, we took pains to note that the claim was strictly cabined.  *Ibid.*  Some of the limitations on recovery were imported from the common law.  The fellow-servant doctrine, in particular, prohibited recovery when an employee suffered an injury due to the negligent act of another employee without negligence on the part of the employer. *Ibid.*; see, *e.g.*, *The Sachem*, 42 F. 66 (EDNY 1890) (deny-

——————

[3] Most of these cases allowed recovery for personal injury in "erroneous reliance" on certain passages in *Dixon* v. *The Cyrus*, 7 F. Cas. 755 (No. 3,930) (Pa. 1789).  Tetreault, Seamen, Seaworthiness, and the Rights of Harbor Workers, 39 Cornell L. Q. 381, 390 (1954) (Tetreault). These cases misread *The Cyrus* as resting on an implied warranty of seaworthiness.  Tetreault 390.  But *The Cyrus* is more fairly read to turn on a theory of true implied condition.  While a warranty would provide a basis for damages if the breach caused an injury, an implied condition would only allow the mariner to escape performance without surrendering the benefit of the contract.  In other words, "[t]he manifest unseaworthiness of the vessel at the commencement of the voyage would excuse non-performance by the mariners but did not constitute a basis for damages."  Tetreault 390.

ing recovery based on fellow-servant doctrine).  Because a claimant had to show that he was injured by some aspect of the ship's condition that rendered the vessel unseaworthy, a claim could not prevail based on "the negligence of the master, or any member of the crew."[4]  *The Osceola*, *supra*, at 175; see also *The City of Alexandria*, 17 F. 390 (SDNY 1883) (no recovery based on negligence that does not render vessel unseaworthy).  Instead, a seaman had to show that the owner of the vessel had failed to exercise due diligence in ensuring the ship was in seaworthy condition.  See generally *Dixon* v. *United States*, 219 F. 2d 10, 12–14 (CA2 1955) (Harlan, J.) (cataloging evolution of the claim).

B

In the early 20th century, then, under "the general maritime law . . . a vessel and her owner . . . were liable to an indemnity for injuries received by a seaman in consequence of the unseaworthiness of the ship and her appliances; but a seaman was not allowed to recover an indemnity for injuries sustained through the negligence of the master or any member of the crew." *Pacific S. S. Co.* v. *Peterson*, 278 U. S. 130, 134 (1928); see also *Plamals* v. *S. S. "Pinar Del Rio,"* 277 U. S. 151, 155 (1928) (vessel was not unseaworthy when mate negligently selected defective rope but sound rope was available on board).  Because of these severe limitations on recovery, "the seaman's right to recover damages for injuries caused by unseaworthiness

––––––––

[4] To be sure, in some instances the concept of "unseaworthiness" expanded to embrace conditions that resulted from the negligence of fellow servants, see, *e.g.*, *Carlisle Packing Co.* v. *Sandanger*, 259 U. S. 255, 259 (1922) (vessel was rendered unseaworthy when it left port with gasoline in a container labeled "coal oil"); see also G. Robinson, Handbook of Admiralty Law in the United States §37, p. 305–307 (1st ed. 1939) (collecting cases).  But it was only after the passage of the Jones Act that negligence by a fellow mariner provided a reliable basis for recovery.  See Part I–B, *infra*.

of the ship was an obscure and relatively little used remedy." G. Gilmore & C. Black, The Law of Admiralty §6–38, p. 383 (2d ed. 1975) (Gilmore & Black).

Tremendous shifts in mariners' rights took place between 1920 and 1950. First, during and after the First World War, Congress enacted a series of laws regulating maritime liability culminating in the Merchant Marine Act of 1920, §33, 41 Stat. 1007 (Jones Act), which codified the rights of injured mariners and created new statutory claims that were freed from many of the common-law limitations on recovery. The Jones Act provides injured seamen with a cause of action and a right to a jury. 46 U. S. C. §30104. Rather than create a new structure of substantive rights, the Jones Act incorporated the rights provided to railway workers under the Federal Employers' Liability Act (FELA), 45 U. S. C. §51 *et seq*. 46 U. S. C. §30104. In the 30 years after the Jones Act's passage, "the Act was the vehicle for almost all seamen's personal injury and death actions." Gilmore & Black §6–20, at 327.

But the Jones Act was overtaken in the 1950s by the second fundamental change in personal injury maritime claims—and it was this Court, not Congress, that played the leading role. In a pair of decisions in the late 1940s, the Court transformed the old claim of unseaworthiness, which had demanded only due diligence by the vessel owner, into a strict-liability claim. In *Mahnich* v. *Southern S. S. Co.*, 321 U. S. 96 (1944), the Court stated that "the exercise of due diligence does not relieve the owner of his obligation" to provide a seaworthy ship and, in the same ruling, held that the fellow-servant doctrine did not provide a defense. *Id.*, at 100, 101. *Mahnich*'s interpretation of the early cases may have been suspect, see Tetreault 397–398 (*Mahnich* rests on "startling misstatement" of relevant precedents), but its assertion triggered a sea-change in maritime personal injury. Less than two years later, we affirmed that the duty of seaworthiness

was "essentially a species of liability without fault . . . neither limited by conceptions of negligence nor contractual in character. It is a form of absolute duty owing to all within the range of its humanitarian policy." *Seas Shipping Co.* v. *Sieracki*, 328 U. S. 85, 94–95 (1946) (citations omitted). From *Mahnich* forward, "the decisions of this Court have undeviatingly reflected an understanding that the owner's duty to furnish a seaworthy ship is absolute and completely independent of his duty under the Jones Act to exercise reasonable care." *Mitchell* v. *Trawler Racer, Inc.*, 362 U. S. 539, 549 (1960). As a result of *Mahnich* and *Sieracki*, between the 1950s and 1970s "the unseaworthiness count [was] the essential basis for recovery with the Jones Act count preserved merely as a jury-getting device."[5] Gilmore & Black §6–20, at 327–328.

The shifts in plaintiff preferences between Jones Act and unseaworthiness claims were possible because of the significant overlap between the two causes of action. See *id.*, §6–38, at 383. One leading treatise goes so far as to describe the two claims as "alternative 'grounds' of recovery for a single cause of action." 2 R. Force & M. Norris, The Law of Seamen §30:90, p. 30–369 (5th ed. 2003). The two claims are so similar that, immediately after the Jones Act's passage, we held that plaintiffs could not submit both to a jury. *Plamals, supra*, at 156–157 ("Seamen may invoke, at their election, the relief accorded by the old rules against the ship, or that provided by the new against the employer. But they may not have the benefit of both"). We no longer require such election. See *McAllister* v. *Magnolia Petroleum Co.*, 357 U. S. 221, 222, n. 2 (1958). But a plaintiff still cannot duplicate his recovery

--------

[5] The decline of Jones Act claims was arrested, although not reversed, by our holding that some negligent actions on a vessel may create Jones Act liability without rendering the vessel unseaworthy. See *Usner* v. *Luckenbach Overseas Corp.*, 400 U. S. 494 (1971); see also 1B Benedict on Admiralty §23, p. 3–35 (7th rev. ed. 2018).

by collecting full damages on both claims because, "whether or not the seaman's injuries were occasioned by the unseaworthiness of the vessel or by the negligence of the master or members of the crew, . . . there is but a single wrongful invasion of his primary right of bodily safety and but a single legal wrong." *Peterson*, 278 U. S., at 138; see also 2 Force, *supra*, §§26:73, 30:90.

## II

Christopher Batterton worked as a deckhand and crew member on vessels owned and operated by the Dutra Group. According to Batterton's complaint, while working on a scow near Newport Beach, California, Batterton was injured when his hand was caught between a bulkhead and a hatch that blew open as a result of unventilated air accumulating and pressurizing within the compartment.

Batterton sued Dutra and asserted a variety of claims, including negligence, unseaworthiness, maintenance and cure, and unearned wages. He sought to recover general and punitive damages. Dutra moved to strike Batterton's claim for punitive damages, arguing that they are not available on claims for unseaworthiness. The District Court denied Dutra's motion, 2014 WL 12538172 (CD Cal., Dec. 15, 2014), but agreed to certify an interlocutory appeal on the question, 2015 WL 13752889 (CD Cal., Feb. 6, 2015).

The Court of Appeals affirmed. 880 F. 3d 1089 (CA9 2018). Applying Circuit precedent, see *Evich* v. *Morris*, 819 F. 2d 256, 258–259 (CA9 1987), the Court of Appeals held that punitive damages are available for unseaworthiness claims. 880 F. 3d, at 1096. This holding reaffirmed a division of authority between the Circuits. Compare *McBride* v. *Estis Well Serv., L. L. C.*, 768 F. 3d 382, 391 (CA5 2014) (en banc) (punitive damages are not recoverable), and *Horsley* v. *Mobil Oil Corp.*, 15 F. 3d 200, 203 (CA1 1994) (same), with *Self* v. *Great Lakes Dredge &*

*Dock Co.*, 832 F. 2d 1540, 1550 (CA11 1987) ("Punitive damages should be available in cases where the shipowner willfully violated the duty to maintain a safe and seaworthy ship . . ."). We granted certiorari to resolve this division. 586 U. S. ___ (2018).

## III

Our resolution of this question is governed by our decisions in *Miles* and *Atlantic Sounding*. *Miles* establishes that we "should look primarily to . . . legislative enactments for policy guidance," while recognizing that we "may supplement these statutory remedies where doing so would achieve the uniform vindication" of the policies served by the relevant statutes. 498 U. S., at 27. In *Atlantic Sounding*, we allowed recovery of punitive damages, but we justified our departure from the statutory remedial scheme based on the established history of awarding punitive damages for certain maritime torts, including maintenance and cure. 557 U. S., at 411–414 (discussing cases of piracy and maintenance and cure awarding damages with punitive components). We were explicit that our decision represented a gloss on *Miles* rather than a departure from it. *Atlantic Sounding*, *supra*, at 420 ("The reasoning of *Miles* remains sound"). And we recognized the importance of viewing each claim in its proper historical context. "'[R]emedies for negligence, unseaworthiness, and maintenance and cure have different origins and may on occasion call for application of slightly different principles and procedures.'" 557 U. S., at 423.

In accordance with these decisions, we consider here whether punitive damages have traditionally been awarded for claims of unseaworthiness and whether conformity with parallel statutory schemes would require such damages. Finally, we consider whether we are compelled on policy grounds to allow punitive damages for unseaworthiness claims.

A

For claims of unseaworthiness, the overwhelming historical evidence suggests that punitive damages are not available. Batterton principally relies on two cases to establish that punitive damages were traditionally available for breach of the duty of seaworthiness. Upon close inspection, neither supports this argument.

*The Rolph*, 293 F. 269, 271 (ND Cal. 1923), involved a mate who brutally beat members of the crew, rendering one seaman blind and leaving another with impaired hearing. The central question in the case was not the form of damages, but rather whether the viciousness of the mate rendered the vessel unseaworthy. *The Rolph*, 299 F. 52, 54 (CA9 1924). The court concluded that the master, by staffing the vessel with such an unsuitable officer, had rendered it unseaworthy. *Id.*, at 55. To the extent the court described the basis for the damages awarded, it explained that the judgment was supported by testimony as to "the expectation of life and earnings of these men." 293 F., at 272. And the Court of Appeals discussed only the seamen's entitlement "to recover an indemnity" for their injuries. 299 F., at 56. These are discussions of compensatory damages—nowhere does the court speak in terms of an exemplary or punitive award.[6]

*The Noddleburn,* 28 F. 855, 857–858 (Ore. 1886), involved an injury to a British seaman serving on a British vessel and was decided under English law. The plaintiff in the case was injured when he fell to the deck after being

---

[6] Even if this case did involve a *sub silentio* punitive award, we share the Fifth Circuit's reluctance to "rely on one dust-covered case to establish that punitive damages were generally available in unseaworthiness cases." *McBride* v. *Estis Well Serv., L. L. C.*, 768 F. 3d 382, 397 (2014) (Clement, J., concurring). Absent a clear historical pattern, *Miles* v. *Apex Marine Corp.*, 498 U. S. 19 (1990), commands us to seek conformity with the policy preferences the political branches have expressed in legislation.

ordered aloft and stepping on an inadequately secured line. *Id.*, at 855. After the injury, the master neglected the man's wounds, thinking the injury a mere sprain. *Id.*, at 856. The leg failed to heal and the man had to insist on being discharged to a hospital, where he learned that he would be permanently disabled. *Ibid.* As damages, the court awarded him accrued wages, as well as $1,000 to compensate for the loss in future earnings from his disability and $500 for his pain and suffering. *Id.*, at 860. But these are purely compensatory awards—the only discussion of exemplary damages comes at the very close of the opinion, and it is clear that they were considered because of the master's failure to provide maintenance and cure. *Ibid.* (discussing additional award "in consideration of the neglect and indifference with which the libelant was treated by the master *after his injury*" (emphasis added)).

Finally, Batterton points to two other cases, *The City of Carlisle*, 39 F. 807 (Ore. 1889), and *The Troop*, 118 F. 769 (Wash. 1902). But these cases, like *The Noddleburn*, both involve maintenance and cure claims that rest on the willful failure of the master and mate to provide proper care for wounded sailors after they were injured. 39 F., at 812 ("master failed and neglected to procure or provide any medical aid or advice . . . and was contriving and intending to get rid of him as easily as possible"); 118 F., at 771 (assessing damages based on provision of Laws of Oleron requiring maintenance). Batterton characterizes these as unseaworthiness actions on the theory that the seamen *could have* pursued that claim. But, because courts award damages for the claims a plaintiff actually pleads rather than those he could have brought, these cases are irrelevant.

The lack of punitive damages in traditional maritime law cases is practically dispositive. By the time the claim of unseaworthiness evolved to remedy personal injury, punitive damages were a well-established part of the

common law. *Exxon Shipping*, 554 U. S., at 491. Ameri-can courts had awarded punitive (or exemplary) damages from the Republic's earliest days. See, *e.g.*, *Genay* v. *Nor-ris*, 1 S. C. L. 6, 7 (1784); *Coryell* v. *Colbaugh*, 1 N. J. L. 77, 78 (1791). And yet, beyond the decisions discussed above, Batterton presents no decisions from the formative years of the personal injury unseaworthiness claim in which exemplary damages were awarded. From this we conclude that, unlike maintenance and cure, unseawor-thiness did not traditionally allow recovery of punitive damages.

B

In light of this overwhelming historical evidence, we cannot sanction a novel remedy here unless it is required to maintain uniformity with Congress's clearly expressed policies. Therefore, we must consider the remedies typi-cally recognized for Jones Act claims.

The Jones Act adopts the remedial provisions of FELA, and by the time of the Jones Act's passage, this Court and others had repeatedly interpreted the scope of damages available to FELA plaintiffs. These early decisions held that "[t]he damages recoverable [under FELA] are limited . . . strictly to the financial loss . . . sustained."[7] *American R. Co. of P. R.* v. *Didricksen*, 227 U. S. 145, 149 (1913); see also *Gulf, C. & S. F. R. Co.* v. *McGinnis*, 228 U. S. 173, 175 (1913) (FELA is construed "only to compensate . . . for the actual pecuniary loss resulting" from the worker's injury or death); *Michigan Central R. Co.* v. *Vreeland*, 227 U. S. 59, 68 (1913) (FELA imposes "a liability for the pecuniary

---

[7] Treatises from the same period lend further support to the view that "in all actions under [FELA], an award of exemplary damages is not permitted." 2 M. Roberts, Federal Liabilities of Carriers §621, p. 1093 (1918); 1 *id.*, §417, at 708; 5 J. Berryman, Sutherland on Damages §1333, p. 5102 (4th ed. 1916) (FELA "provid[es] compensation for pecuniary loss or damage only").

damage resulting to [the worker] and for that only"). In one particularly illuminating case, in deciding whether a complaint alleged a claim under FELA or state law, the Court observed that if the complaint "were read as manifestly demanding exemplary damages, that would point to the state law." *Seaboard Air Line R. Co.* v. *Koennecke*, 239 U. S. 352, 354 (1915). And in the years since, Federal Courts of Appeals have unanimously held that punitive damages are not available under FELA. *Miller* v. *American President Lines*, *Ltd.*, 989 F. 2d 1450, 1457 (CA6 1993); *Wildman* v. *Burlington No. R. Co.*, 825 F. 2d 1392, 1395 (CA9 1987); *Kozar* v. *Chesapeake & Ohio R. Co.*, 449 F. 2d 1238, 1243 (CA6 1971).

Our early discussions of the Jones Act followed the same practices. We described the Act shortly after its passage as creating "an action for compensatory damages, on the ground of negligence."[8] *Peterson*, 278 U. S., at 135. And we have more recently observed that the Jones Act "limits recovery to pecuniary loss." *Miles*, 498 U. S., at 32. Looking to FELA and these decisions, the Federal Courts of Appeals have uniformly held that punitive damages are not available under the Jones Act. *McBride*, 768 F. 3d, at 388 ("[N]o cases have awarded punitive damages under the Jones Act"); *Guevara* v. *Maritime Overseas Corp.*, 59 F. 3d 1496, 1507, n. 9 (CA5 1995) (en banc); *Horsley*, 15 F. 3d, at 203; *Miller*, *supra*, at 1457 ("Punitive damages are not . . . recoverable under the Jones Act"); *Kopczynski* v. *The Jacqueline*, 742 F. 2d 555, 560 (CA9 1984).

Batterton argues that these cases are either inapposite or wrong, but because of the absence of historical evidence to support punitive damages—evidence that was central to

---

[8] We also note that Congress declined to allow punitive damages when it enacted the Death on the High Seas Act. 46 U. S. C. §30303 (allowing "fair compensation for the pecuniary loss sustained" for a death on the high seas).

our decision in *Atlantic Sounding*—we need not reopen this question of statutory interpretation. It is enough for us to note the general consensus that exists in the lower courts and to observe that the position of those courts conforms with the discussion and holding in *Miles*. Adopting the rule urged by Batterton would be contrary to *Miles*'s command that federal courts should seek to promote a "uniform rule applicable to all actions" for the same injury, whether under the Jones Act or the general maritime law. 498 U. S., at 33.

C

To the extent Batterton argues that punitive damages are justified on policy grounds or as a regulatory measure, we are unpersuaded. In contemporary maritime law, our overriding objective is to pursue the policy expressed in congressional enactments, and because unseaworthiness in its current strict-liability form is our own invention and came after passage of the Jones Act, it would exceed our current role to introduce novel remedies contradictory to those Congress has provided in similar areas. See *id.*, at 36 (declining to create remedy "that goes well beyond the limits of Congress' ordered system of recovery"). We are particularly loath to impose more expansive liabilities on a claim governed by strict liability than Congress has imposed for comparable claims based in negligence. *Ibid.* And with the increased role that legislation has taken over the past century of maritime law, we think it wise to leave to the political branches the development of novel claims and remedies.

We are also wary to depart from the practice under the Jones Act because a claim of unseaworthiness—more than a claim for maintenance and cure—serves as a duplicate and substitute for a Jones Act claim. The duty of maintenance and cure requires the master to provide medical care and wages to an injured mariner in the period after

the injury has occurred. *Calmar S. S. Corp.*, 303 U. S., at
527–528. By contrast, both the Jones Act and unseawor-
thiness claims compensate for the injury itself and for the
losses resulting from the injury. *Peterson*, *supra*, at 138.
In such circumstances, we are particularly mindful of the
rule that requires us to promote uniformity between mari-
time statutory law and maritime common law.[9] See *Miles*,
*supra*, at 27. See also *Mobil Oil Corp.* v. *Higginbotham*,
436 U. S. 618, 625 (1978) (declining to recognize loss-of-
society damages under general maritime law because that
would "rewrit[e the] rules that Congress has affirmatively
and specifically enacted").

Unlike a claim of maintenance and cure, which addresses
a situation where the vessel owner and master have "just
about every economic incentive to dump an injured sea-
man in a port and abandon him to his fate," in the unsea-
worthiness context the interests of the owner and mariner
are more closely aligned. *McBride*, *supra*, at 394, n. 12
(Clement, J., concurring). That is because there are signif-

_____

[9] The dissent, *post* at 9, and n. 7 (opinion of GINSBURG, J.), suggests
that because of the existing differences between a Jones Act claim and
an unseaworthiness claim, recognizing punitive damages would not be
a cause of disparity. But, as the dissent acknowledges, much of the
expanded reach of the modern unseaworthiness doctrine can be at-
tributed to innovations made by this Court following the enactment of
the Jones Act. See *post* at 8, and n. 6; *supra*, at 7–8. Although Batter-
ton and the dissent would continue this evolution by recognizing
damages previously unavailable, *Miles* dictates that such innovation is
the prerogative of the political branches, our past expansion of the
unseaworthiness doctrine notwithstanding.

Of course, *Miles* recognized that the general maritime law need not
be static. For example, our decision in *Moragne* v. *States Marine Lines,
Inc.*, 398 U. S. 375 (1970), smoothed a disjunction created by the
imperfect alignment of statutory claims with past decisions limiting
maritime claims for wrongful death. But when there is no disjunc-
tion—as here, where traditional remedies align with modern statutory
remedies—we are unwilling to endorse doctrinal changes absent
legislative changes.

icant economic incentives prompting owners to ensure that their vessels are seaworthy. Most obviously, an owner who puts an unseaworthy ship to sea stands to lose the ship and the cargo that it carries. And if a vessel's unseaworthiness threatens the crew or cargo, the owner risks losing the protection of his insurer (who may not cover losses incurred by the owner's negligence) and the work of the crew (who may refuse to serve on an unseaworthy vessel). In some instances, the vessel owner may even face criminal penalties. See, *e.g.*, 46 U. S. C. §10908.

Allowing punitive damages on unseaworthiness claims would also create bizarre disparities in the law. First, due to our holding in *Miles*, which limited recovery to compensatory damages in wrongful-death actions, a mariner could make a claim for punitive damages if he was injured onboard a ship, but his estate would lose the right to seek punitive damages if he died from his injuries. Second, because unseaworthiness claims run against the owner of the vessel, the ship's owner could be liable for punitive damages while the master or operator of the ship—who has more control over onboard conditions and is best positioned to minimize potential risks—would not be liable for such damages under the Jones Act. See *Sieracki*, 328 U. S., at 100 (The duty of seaworthiness is "peculiarly and exclusively the obligation of the owner. It is one he cannot delegate").

Finally, because "[n]oncompensatory damages are not part of the civil-code tradition and thus unavailable in such countries," *Exxon Shipping*, 554 U. S., at 497, allowing punitive damages would place American shippers at a significant competitive disadvantage and would discourage foreign-owned vessels from employing American seamen. See Gotanda, Punitive Damages: A Comparative Analysis, 42 Colum. J. Transnat'l L. 391, 396, n. 24 (2004) (listing civil-law nations that restrict private plaintiffs to compensatory damages). This would frustrate another

"fundamental interest" served by federal maritime juris-diction: "the protection of maritime commerce." *Norfolk Southern R. Co.* v. *James N. Kirby*, *Pty Ltd.*, 543 U. S. 14, 25 (2004) (internal quotation marks omitted; emphasis deleted).

Against this, Batterton points to the maritime doctrine that encourages special solicitude for the welfare of sea-men. But that doctrine has its roots in the paternalistic approach taken toward mariners by 19th century courts. See, *e.g.*, *Harden*, 11 F. Cas., at 485; *Brown*, 4 F. Cas., at 409. The doctrine has never been a commandment that maritime law must favor seamen whenever possible. Indeed, the doctrine's apex coincided with many of the harsh common-law limitations on recovery that were not set aside until the passage of the Jones Act. And, while sailors today face hardships not encountered by those who work on land, neither are they as isolated nor as depend-ent on the master as their predecessors from the age of sail. In light of these changes and of the roles now played by the Judiciary and the political branches in protecting sailors, the special solicitude to sailors has only a small role to play in contemporary maritime law. It is not suffi-cient to overcome the weight of authority indicating that punitive damages are unavailable.

## IV

Punitive damages are not a traditional remedy for un-seaworthiness. The rule of *Miles*—promoting uniformity in maritime law and deference to the policies expressed in the statutes governing maritime law—prevents us from recognizing a new entitlement to punitive damages where none previously existed. We hold that a plaintiff may not recover punitive damages on a claim of unseaworthiness.

Opinion of the Court

We reverse the judgment of the United States Court of Appeals for the Ninth Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

─────────

No. 18–266

─────────

## THE DUTRA GROUP, PETITIONER
## *v.* CHRISTOPHER BATTERTON

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 24, 2019]

JUSTICE GINSBURG, with whom JUSTICE BREYER and
JUSTICE SOTOMAYOR join, dissenting.

In *Exxon Shipping Co.* v. *Baker*, 554 U. S. 471 (2008),
the Court recognized that punitive damages normally are
available in maritime cases. *Id.*, at 489–490, 502, 508,
n. 21. Relying on *Miles* v. *Apex Marine Corp.*, 498 U. S. 19
(1990), the Court today holds that unseaworthiness claims
are an exception to that general rule. Respondent Chris-
topher Batterton, defending the Ninth Circuit's decision in
his favor, relies on the Court's more recent decision in
*Atlantic Sounding Co.* v. *Townsend*, 557 U. S. 404 (2009).
In my view, the Ninth Circuit correctly determined that
*Atlantic Sounding* is the controlling precedent. See 880
F. 3d 1089, 1095–1096 (2018) (case below). I would there-
fore affirm the judgment of the Court of Appeals, cogently
explained in Senior Circuit Judge Kleinfeld's opinion.

## I

Batterton was employed as a deckhand for petitioner
The Dutra Group, a dredging and marine construction
company. As Batterton worked on a Dutra vessel, fellow
crewmembers pumped pressurized air into a below-decks
compartment. The build up of pressurized air blew open a
hatch cover that crushed Batterton's hand, permanently
disabling him. The accident could have been prevented,

Batterton alleges, by a valve to vent excess air from the compartment, something to hold the hatch cover open, or simply better warnings or supervision.

Batterton filed a civil action asserting one claim of negligence under the Jones Act[1] and two claims under general maritime law: one for breach of the duty to provide a seaworthy vessel and one for breach of the duty to provide maintenance and cure.[2] As to his unseaworthiness claim, Batterton sought punitive damages, alleging that Dutra's breach was wanton and willful.

Dutra moved to strike or dismiss Batterton's punitive damages request. The District Court denied the motion, 2014 WL 12538172, *2 (CD Cal. Dec. 15, 2014), and the Ninth Circuit, accepting an interlocutory appeal, affirmed, 880 F. 3d 1089. Longstanding Ninth Circuit precedent, the court observed, recognized the availability of punitive damages in seamen's actions for unseaworthiness. *Id.*, at 1091 (citing *Evich* v. *Morris*, 819 F. 2d 256, 258 (1987)). *Miles*, 498 U. S., at 29–33, which held that loss-of-society damages are not available in survivors' actions for unseaworthiness resulting in a seaman's wrongful death, the court observed, did not undermine that precedent. 880 F. 3d, at 1093–1096. "Whatever room might [have] be[en] left to support broadening *Miles* to cover punitive damages" sought by a seaman, the Ninth Circuit said, "was cut off by

---

[1] The Jones Act provides: "A seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman[,] may elect to bring a civil action at law, with the right of trial by jury, against the employer. Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section." 46 U. S. C. §30104.

[2] "Maintenance and cure" is the right of "the seaman, ill or injured in the service of the ship without willful misbehavior on his part[ to] wages to the end of the voyage and subsistence, lodging, and medical care to the point where the maximum cure attainable has been reached." 2 R. Force & M. Norris, The Law of Seamen §26:1, p. 26–4 (5th ed. 2003).

[this] Court's decision in *Atlantic Sounding*," in which this Court, recognizing that "historically, punitive damages have been available and awarded in general maritime actions," held that such damages are available in seamen's suits for maintenance and cure. *Id.*, at 1095. (quoting *Atlantic Sounding*, 557 U. S., at 407; alteration omitted). Punitive damages, the Ninth Circuit concluded, are similarly available when a seaman sues for unseaworthiness under general maritime law.

## II

I turn now to an examination of *Miles* and *Atlantic Sounding* closer than the attention accorded those decisions by the Court.

*Miles*, decided in 1990, addressed this question: In a wrongful-death action premised on unseaworthiness, may a deceased seaman's parent recover damages for loss of society? 498 U. S., at 21. As the Court explained in *Miles*, historically, general maritime law did not recognize a cause of action for wrongful death. *Id.*, at 23 (citing *The Harrisburg*, 119 U. S. 199 (1886)). But since the late 19th century, every State had adopted a statutory wrongful-death cause of action. *Miles*, 498 U. S., at 23. And in two statutes, Congress had provided for wrongful-death recoveries in maritime cases. *Ibid.* First, the Jones Act, 46 U. S. C. §30104, provided a right of action for the survivor of a seaman killed in the course of his employment. Second, the Death on the High Seas Act (DOHSA), 46 U. S. C. §30301 *et seq.*, provided a right of action for the survivor of anyone killed "by wrongful act, neglect, or default . . . on the high seas." §30302; *Miles*, 498 U. S., at 24. But the Jones Act and DOHSA left some wrongful deaths at sea without a remedy. See *Miles*, 498 U. S., at 25–26.[3] To fill

--------

[3] These were the unprovided-for cases: "First, in territorial waters, general maritime law allowed a remedy for unseaworthiness resulting in injury, but not for death. Second, DOHSA allowed a remedy for

gaps in this statutory regime, and in light of legislative abrogation of the common-law disallowance of wrongful-death claims, the Court in *Moragne* v. *States Marine Lines, Inc.*, 398 U. S. 375, 409 (1970), recognized a general maritime cause of action for the wrongful death of a long-shoreman. See also *Miles*, 498 U. S., at 26–30 (claim for wrongful death is also available to seamen's survivors).

After recounting this history, the *Miles* Court addressed the damages relief available for maritime wrongful death. Because "Congress and the States ha[d] legislated extensively in" the field of maritime law, the Court stated, "admiralty court[s] should look primarily to these legislative enactments for policy guidance." *Id.*, at 27. Congress had expressly limited damages recoverable under DOHSA to "pecuniary loss" sustained by the decedent's survivor. *Id.*, at 31 (citing 46 U. S. C. App. §762, recodified at §30303). And the Jones Act adopted the substantive provisions of the Federal Employers Liability Act, 45 U. S. C. §51 *et seq.*, which the Court construed to confine wrongful-death damages to "pecuniary loss." *Miles*, 498 U. S., at 32. The *Miles* Court reasoned that loss-of-society damages were nonpecuniary, that such damages could not be recovered under DOHSA or the Jones Act, and that it would "be inconsistent with [the Court's] place in the constitutional scheme . . . to sanction more expansive remedies" under general maritime law. *Miles*, 498 U. S.,

---

death resulting from unseaworthiness on the high seas, but general maritime law did not allow such recovery for a similar death in territorial waters. Finally, . . . in those States whose statutes allowed a claim for wrongful death resulting from unseaworthiness, recovery was available for the death of a longshoreman due to unseaworthiness, but not for the death of a Jones Act seaman. This was because wrongful death actions under the Jones Act are limited to negligence, and the Jones Act pre-empts state law remedies for the death or injury of a seaman." *Miles* v. *Apex Marine Corp.*, 498 U. S. 19, 26 (1990) (citation omitted).

at 31–33.[4]

Some 19 years after *Mile*s, in *Atlantic Sounding*, this Court held that punitive damages are available in actions for maintenance and cure under general maritime law. 557 U. S., at 408. *Atlantic Sounding*'s reasoning had four components. First, the Court observed, punitive damages had a long common-law pedigree. *Id.*, at 409–410. Second, the "general rule that punitive damages were available at common law extended to claims arising under federal maritime law." *Id.*, at 411; see *id.*, at 411–412. Third, "[n]othing in maritime law undermine[d] the applicability of this general rule in the maintenance and cure context," notwithstanding slim evidence that punitive damages were historically awarded in maintenance and cure actions. *Id.*, at 412; see *id.*, at 412–415, and n. 4. Finally, neither the Jones Act nor any other statute indicated that Congress sought to displace the presumption that remedies generally available under the common law are available for maritime claims. While the Jones Act armed seamen with a statutory action for negligence attributable to a vessel operator, that remedy, *Atlantic Sounding* noted, did not curtail pre-existing maritime causes of action and remedies. *Id.*, at 415–418. The *Atlantic Sounding* Court rejected as "far too broad" the argument that the remedies available under general maritime law were confined to those available under the Jones Act or DOHSA. *Id.*, at 418–419.

———————

[4] The *Miles* Court relied on comparable reasoning in denying the deceased seaman's estate, which had brought a survival action, the right to recover future earnings. See *id.*, at 33–37. Under "the traditional maritime rule," "there [wa]s no survival of unseaworthiness claims." *Id.*, at 34. The Court declined to decide whether to recognize a general maritime survival right, however, because, even if such a right were recognized, it would not support recovery of lost future income. *Ibid.* This damages limitation followed from the Jones Act, DOHSA, and most States' laws, which did not permit recovery of such damages. See *id.*, at 35–36.

The *Atlantic Sounding* inquiries control this case. As in *Atlantic Sounding*, "both the general maritime cause of action"—here, unseaworthiness—"and the remedy (punitive damages) were well established before the passage of the Jones Act." 557 U. S., at 420; *Mitchell* v. *Trawler Racer*, *Inc.*, 362 U. S. 539, 544 (1960); *The Osceola*, 189 U. S. 158, 175 (1903). And, unlike the maritime wrongful-death action at issue in *Miles*, Batterton's claim of unseaworthiness resulting in personal injury was not created to fill gaps in a statutory scheme. See *Atlantic Sounding*, 557 U. S., at 420; *Miles*, 498 U. S., at 27, 36. The damages available for Batterton's unseaworthiness claim, *Atlantic Sounding* therefore signals, need not track those available under the Jones Act. See 557 U. S., at 424, n. 12.

## III

Applying *Atlantic Sounding*'s test, see *supra*, at 5, punitive damages are not categorically barred in unseaworthiness actions. *Atlantic Sounding* itself answers the first two inquiries. See *supra*, at 5. "Punitive damages have long been an available remedy at common law for wanton, willful, or outrageous conduct." 557 U. S., at 409; see *id.*, at 409–410. And "[t]he general rule that punitive damages [are] available at common law extended to claims arising under federal maritime law." *Id.*, at 411; see *id.*, at 411–412. As next explained, the third and fourth components of *Atlantic Sounding*'s test are also satisfied.

## A

*Atlantic Sounding* asks, third, whether anything in maritime law "undermines the applicability [to the maritime action at issue] of th[e] general rule" that punitive damages are available under general maritime law. *Id.*, at 412. True, there is no evidence that courts awarded punitive damages for unseaworthiness before the mid-20th century. See *ante*, at 11–13. But neither is there

evidence that punitive damages were *unavailable* in un-seaworthiness actions. Tr. of Oral Arg. 17.

Contrary to the Court's assertion, evidence of the availability of punitive damages for maintenance and cure was not "central to our decision in *Atlantic Sounding*." *Ante*, at 14–15. Far from it. "[A] search for cases in which punitive damages were awarded for the willful denial of maintenance and cure . . . yields very little." *Atlantic Sounding*, 557 U. S., at 430 (ALITO, J., dissenting). The Court in *Atlantic Sounding* invoked historical evidence about punitive damages in maintenance and cure actions, "strikingly slim" though it was, *id.*, at 431, only to underscore this point: Without a showing that punitive damages were unavailable, the generally applicable common-law rule allowing punitive damages should not be displaced. See *id.*, at 412–415 (majority opinion). Here, too, the absence of evidence that punitive damages were unavailable in unseaworthiness cases supports adherence to the general common-law rule permitting punitive damages.

## B

*Atlantic Sounding* asks fourth: Has Congress "enacted legislation departing from th[e] common-law understanding" that punitive damages are generally available? See *id.*, at 415. Dutra contends that unseaworthiness claims and claims under the Jones Act are "simply two paths to compensation for the same injury." Brief for Petitioner 19–20 (emphasis deleted). Positing that punitive damages are unavailable under the Jones Act,[5] Dutra concludes they are likewise unavailable in unseaworthiness suits. *Id.*, at 17. See also *ante*, at 13–15. Dutra's argument is unavailing, for the Jones Act does not preclude the award of punitive damages in unseaworthiness cases.

--------------------

[5] This Court has not decided whether punitive damages are available under the Jones Act. See *Atlantic Sounding Co.* v. *Townsend*, 557 U. S. 404, 424, n. 12 (2009) (reserving the question).

As noted, the Jones Act provides a cause of action for a seaman injured by his or her employer's negligence. 46 U. S. C. §30104. Congress passed the Act "primarily to overrule *The Osceola*, [189 U. S. 158,] in which this Court prohibited a seaman or his family from recovering for injuries or death suffered due to his employers' negligence." *Atlantic Sounding*, 557 U. S., at 415. The Jones Act was intended to "enlarge th[e] protection" afforded to seamen, "not to narrow it." *The Arizona* v. *Anelich*, 298 U. S. 110, 123 (1936). Accordingly, the Jones Act did not provide an "exclusive remedy" for seamen's injuries; instead, it "preserve[d]" and supplemented "common-law causes of action." *Atlantic Sounding*, 557 U. S., at 416–417. As *Miles* itself recognized, the Jones Act "d[id] not disturb seamen's general maritime claims for injuries resulting from unseaworthiness." 498 U. S., at 29.

When the Jones Act was enacted, unseaworthiness and negligence were "discrete concepts": Unseaworthiness related "to the structure of the ship and the adequacy of [its] equipment and furnishings," while negligence concerned "the direction and control of operations aboard ship." G. Gilmore & C. Black, Law of Admiralty §6–3, p. 277 (2d ed. 1975). Because these actions were distinct, it is improbable that, by enacting the Jones Act, Congress meant to limit the remedies available in unseaworthiness cases. Though unseaworthiness and Jones Act negligence now "significant[ly] overlap," *ante*, at 8, that overlap resulted primarily from mid-20th-century judicial decisions expanding the scope of unseaworthiness liability. See *Mitchell*, 362 U. S., at 547–550.[6] Those decisions do not so

---

[6] In particular, this Court held that a shipowner's duty to provide a seaworthy vessel was "absolute," thereby rendering unseaworthiness a strict-liability tort. *Seas Shipping Co.* v. *Sieracki*, 328 U. S. 85, 94–95 (1946); *Mahnich* v. *Southern S. S. Co.*, 321 U. S. 96, 100–101 (1944); see 1B Benedict on Admiralty §23, pp. 3–12 to 3–16 (7th rev. ed. 2018). In addition, courts broadened the range of conditions that could render a

much as hint that Congress, in enacting the Jones Act, intended to cabin the relief available for unseaworthiness. Even today, unseaworthiness and Jones Act negligence are "not identical." 2 R. Force & M. Norris, The Law of Seamen §27:25, p. 27–61 (5th ed. 2003).[7] The persistent differences between unseaworthiness and Jones Act claims weigh against inserting into general maritime law damages limitations that may be applicable to Jones Act suits. See *supra*, at 7, n. 5.[8]

The Court observes that a plaintiff may not recover twice for the same injury under the Jones Act and unseaworthiness. *Ante*, at 9. True enough. But the Court does not explain why a bar to double recovery of compensatory damages should affect the availability of a single award of punitive damages. Notably, punitive damages are not awarded to compensate the plaintiff; their office is to punish the defendant and deter misconduct. See *Exxon*,

---

vessel unseaworthy. *Id.*, §23, at 3–16 to 3–19.

[7] Unseaworthiness is a strict-liability tort, *ante*, at 7–8; the Jones Act requires proof of negligence, *Lewis* v. *Lewis & Clark Marine, Inc.*, 531 U. S. 438, 441 (2001). Unseaworthiness claims run against the vessel's owner, *Mahnich*, 321 U. S., at 100; Jones Act claims are brought against the seaman's "employer," §30104. Injury caused by the negligent act or omission of a fit fellow crewmember may be actionable under the Jones Act but is not ground for an unseaworthiness suit. 1B Benedict on Admiralty §23, at 3–34 to 3–38; see *Usner* v. *Luckenbach Overseas Corp.*, 400 U. S. 494 (1971). And a vessel owner is liable for unseaworthiness only when the unseaworthy condition proximately caused the plaintiff's injury; under the Jones Act, a plaintiff can prevail upon showing the "slight[est]" causal connection between the defendant's conduct and the plaintiff's injury. 2 Force & Norris, The Law of Seamen §27:25, at 27–62 to 27–63. See also *id.*, §27:2, at 27–7, and n. 6 (the duty to provide a seaworthy vessel may run to "seamen" who do not qualify as such under the Jones Act).

[8] The Court recognizes "that the general maritime law need not be static," but would confine changes in that law to those needed to align it with statutory law. *Ante*, at 16, n. 9. As just stated, however, *supra*, at 8–9, the Jones Act was intended to augment, not to cabin, relief available to seamen.

554 U. S., at 492; W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts §2, p. 9 (5th ed. 1984). There is thus no tension between preventing double recovery of compensatory damages and allowing the recovery, once, of punitive damages.

## IV

Finally, the Court takes up policy arguments against the availability of punitive damages in unseaworthiness actions. *Ante*, at 15–18. The Court, however, has long recognized the general availability of punitive damages under maritime law. *E.g.*, *Atlantic Sounding*, 557 U. S., at 411–412; *Exxon*, 554 U. S., at 489–490; *The Amiable Nancy*, 3 Wheat. 546, 558 (1818).

Punitive damages serve to deter and punish "lawless misconduct." *Ibid.* The imperative of countering a "heightened threat of harm," *Exxon*, 554 U. S., at 490, is especially pressing with regard to sailors, who face unique "hazards in the ship's service," *Harden* v. *Gordon*, 11 F. Cas. 480, 483 (No. 6,047) (CC Me. 1823) (Story, J.). These dangers, more than paternalistic 19th-century attitudes towards sailors, see *ante*, at 18, account for the Court's "'special solicitude'" for "those who undertake to 'venture upon hazardous and unpredictable sea voyages.'" *Air & Liquid Systems Corp.* v. *DeVries*, 586 U. S. ___, ___ (2019) (slip op., at 9) (quoting *American Export Lines, Inc.* v. *Alvez*, 446 U. S. 274, 285 (1980)).

Dutra and the Court warn that allowing punitive damages in unseaworthiness actions could impair maritime commerce. Brief for Petitioner 33–34; *ante*, at 17–18. But punitive damages have been available in maintenance and cure cases in all Circuits for the last decade, *Atlantic Sounding*, 557 U. S. 404, and in unseaworthiness cases in some Circuits for longer, see *Self* v. *Great Lakes Dredge & Dock Co.*, 832 F. 2d 1540, 1550 (CA11 1987); *Evich*, 819 F. 2d, at 258. No tidal wave has overwhelmed commerce

in those Circuits.

Permitting punitive damages for unseaworthiness, the Court further urges, would create "bizarre disparities." *Ante*, at 17. I see no "bizarre disparit[y]" in allowing an injured sailor to seek remedies unavailable to survivors of deceased seamen. See Keeton, *supra*, §127, at 949, 951 (state wrongful-death statutes frequently limit survivors' recoveries to pecuniary damages). Nor is it "bizarre" to permit recovery of punitive damages against a shipowner "for injuries due to unseaworthiness of the vessel." *The Arizona*, 298 U. S., at 120. Exposure to such damages helps to deter wrongdoing, particularly when malfeasance is "hard to detect." *Exxon*, 554 U. S., at 494. If there is any "bizarre disparit[y]," it is the one the Court today creates: Punitive damages are available for willful and wanton breach of the duty to provide maintenance and cure, but not for similarly culpable breaches of the duty to provide a seaworthy vessel.

\*  \*  \*

For the reasons stated, I would affirm the Court of Appeals' judgment.